**Kimberly MILLER, Plaintiff–Appellant,**

**v.**

**AMERICAN FAMILY MUTUAL INSURANCE COMPANY, Defendant–Appellee.**

**No. 99–1537.**

United States Court of Appeals, Seventh Circuit.

Argued Sept. 29, 1999

Decided Feb. 16, 2000

Eric J. Haag (argued), Gingras & Cates, Madison, WI, for plaintiff-appellant.

Earl H. Munson (argued), Boardman, Suhr, Curry & Field, Madison, WI, for defendant-appellee.

Before WOOD, Jr., MANION, and EVANS, Circuit Judges.

MANION, Circuit Judge.

Kimberly Miller worked for American Family Mutual Insurance Company for eight years. She was a good employee who was twice promoted and who regularly received raises. Unlike her co-workers, she also gave birth to four children during her tenure. It was because of her pregnancies, she suspected, that she was not being paid as highly as her co-workers. After confronting her supervisors over her salary disparity, Miller was terminated. She sued American Family under Title VII, asserting that it discriminated against her with respect to her pay because of her pregnancies, and then fired her when she complained about it. In a thorough and well-reasoned opinion, the district court granted American Family's motion for summary judgment on both of Miller's claims. We affirm.

### I. Background

The following facts are undisputed for purposes of summary judgment.

American Family hired Miller in 1988 as a Special Projects Clerk at $5.70/hr. Over the next eighteen months, it twice increased her wages (first to $6.10/hr. and then to $6.53/hr.). In 1990, American Family promoted her to Advertising Coordinator in the Direct Marketing Unit of its Advertising Department at an annual salary of $19,965. It gave her four raises over the next four years, with her salary reaching $28,073 by 1994.

On April 15, 1994, American Family promoted Miller to Direct Marketing Specialist–Advertising at an annual salary of $32,994. This promotion occurred about three months after the birth of her third child and one month after she returned from maternity leave. American Family raised

Miller's salary to $36,323 in 1995 and to $38,473 in 1996. Her salary increases for 1994, 1995, and 1996 were the highest increases each year of any employee in her department.

Nevertheless, Miller was the lowest-paid person in her department in each of those years. American Family has three ranges of salaries for each position: minimum, mid-range, and maximum. Her 1994 and 1995 raises were needed to bring Miller up to the minimum range salary for her position. And her 1996 raise left her salary almost $2,000 below the bottom cut-off for her position's mid-range salary. Still, during her eight-year tenure, Miller received two promotions and a total pay increase from $11,115.00/year in 1988 (as an hourly employee) to $38,473/year in 1996 (as a salaried employee), and she was making progress with respect to American Family's three salary categories (rising from "minimum" in 1994 and 1995 to approaching "mid-range" in 1996). During this eight-year period, Miller gave birth to four children. She took four maternity leaves totaling thirty weeks in addition to 87 vacation and personal days.

From the time Miller was promoted to Specialist until she was fired, none of her four, female co-workers became pregnant or took maternity leave, and all were paid more than she, even those whom Miller had helped train. American Family explains that it paid Miller's colleagues more because they were in a higher position (and had been in that position longer); had been with the company much longer; had earned M.B.A.s (which Miller did not have); or had more experience in direct marketing and benefitted from "salary compression"—a condition where to attract employees from outside the company, American Family has to pay them more to perform the same job than it pays its existing employees who have equal or more experience. In this way, the salaries of its existing employees (in this case, Miller) are "compressed" relative to those of its newer hires.

█ By January 1995, Miller had discovered that she was the lowest-paid member of her unit and asked Ann Knapstein (then the head of Direct Marketing) whether it was because of her pregnancies. Miller asserts that Knapstein responded by "simply turn[ing] around, mad, and slamm[ing] one of the drawers on her desk."[1]

On July 31, 1995, Andy King succeeded Knapstein as head of Direct Marketing. He had not previously worked for American Family. King thought all five of Direct Marketing's employees deserved raises, but he had a fixed pool of money to allocate among them. As a matter of company policy, he could not withhold raises from deserving, newer employees (in order to award Miller a higher raise) simply because they benefitted from "salary compression" vis-a-vis Miller. King would give Miller the largest raise in her unit, although this would still leave her almost $2,000 below mid-range.

King met with Miller on April 16, 1996 to discuss her raise. She was disappointed to learn she was going to be paid well below mid-range. She asked King what she needed to do to get up to mid-range. She claims his response was "You just have to stop having kids and I'll get you up to mid-range in a couple of years."[2] About

---

1. Miller's account of this incident is from her affidavit in response to American Family's motion for summary judgment, and is the account she sets out in her Statement of Facts before this court. In her earlier deposition, however, she testified that Knapstein's response was "to g[e]t very nervous and ... sa[y] no, that's not the reason." We generally look with disfavor on using affidavits that contradict earlier deposition testimony. *See Adusumilli v. City of Chicago*, 164 F.3d 353, 360 (7th Cir.1998) ("where [prior] deposition and affidavit are in conflict, the affidavit is to be disregarded unless it is demonstrable that the statement in the deposition was mistaken."). In this case, we shall allow Miller to use her more favorable affidavit version of Knapstein's reaction because it still does not substantiate her claims.

2. King admits he told Miller that by working within the parameters of the company's compensation system he would try to get her salary to the mid-range level in a couple of

one month after this meeting, in May 1996, Miller told King and Knapstein that she was pregnant again.

Upset that she was being paid less than her Direct Marketing co-workers, Miller demanded a meeting with her supervisors. On June 27, 1996, Miller met with King and Knapstein and asked them why she was the lowest-paid person in her unit. Knapstein said that she had tried to get Miller a higher salary when Miller was promoted to Specialist in 1994, and King said that Miller had received the highest raise of anyone in Direct Marketing that year. Miller stated that although she was happy with her work, she was not happy with her pay and wanted to be compensated fairly.

But then, according to her own copious notes of the meeting, she told Knapstein and King that the Advertising Department had "flunked every one" of the "10 big mistakes" of management. And she told King that he was a "political hire" who was put in a position where he did not have the knowledge he needed to do his job. Miller added that she had two accordion binders at her home filled with problems concerning one of her co-workers. She then gave King and Knapstein the following ultimatum: she would give them until the end of July to find out whether there was money available to raise her salary to an appropriate level; she added that "[i]f you can't even answer that question, I will be leaving the company."

On July 1, 1996, King and Knapstein met with Miller. King told Miller there was no more money available to give her a higher raise. (Miller claims King made only a half-hearted effort to obtain more money for her because of his anti-pregnancy bias.) Miller responded: "Then I will

be leaving the company. Before I make any final decisions on when that will be, I first need to make a few phone calls, check the contract I have with my baby sitter and speak with my husband." She told King she would meet with him in a few days to tell him her decision.

On July 3, Miller sent King an e-mail stating that she had discussed the situation with her husband and decided that "she would not be leaving the company *in the near future.*" (Emphasis added.) On July 8, Miller met with King, Knapstein, and a woman from the company's Human Resources Department. Miller was advised that she was terminated, effective immediately. American Family's reasons were: (1) Miller's "raise-or-quit" ultimatum was inappropriate; (2) it was concerned that she would not be a "team player" in the future, given her views about her supervisors and her file on a co-worker; (3) it feared her lack of commitment to the company, given her statements about leaving; and (4) it felt she was unhappy because she was not getting paid what she felt she deserved and would leave soon anyway.

■ On October 7, 1996, Miller filed a complaint against American Family with the Wisconsin Equal Rights Division (ERD).[3] After receiving a right to sue letter from the EEOC, Miller brought suit against American Family under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, as amended by the Pregnancy Discrimination Act (PDA), 42 U.S.C. § 2000e(k). She claimed that from the day she was promoted to Specialist in Direct Marketing until her termination, American Family paid her less than her co-workers because of her pregnancies. She also claimed that American Family retaliated against her by firing her (a) when she complained about it; and (b) because she was pregnant.[4]

years; he denies he told Miller that he would condition his doing so on her not becoming pregnant again.

**3.** In Wisconsin, a plaintiff alleging discrimination under Title VII must first file a complaint with either the Equal Employment Opportunity Commission (EEOC) or the ERD within 300 days of the alleged discriminatory

conduct. *See* 42 U.S.C. § 2000e–5(e); *Speer v. Rand McNally & Co.,* 123 F.3d 658, 662 & n.1 (7th Cir.1997); *Alvey v. Rayovac Corp.,* 922 F.Supp. 1315, 1326 (W.D. Wis.1996).

**4.** In her complaint, Miller also alleged that American Family denied her promotions because of her pregnancies in violation of Title

American Family moved for summary judgment. Because Miller filed her discrimination claim with the ERD on October 7, 1996, the district court first held that her claim of pregnancy discrimination prior to December 12, 1995, the date the 300–day statute of limitations expired (note 3, *supra*), was untimely. With respect to Miller's remaining claims of discrimination, the district court held that Miller failed to show that American Family's proffered non-discriminatory reasons for paying her colleagues more than her were false or "pretextual." The court also rejected Miller's alternative argument of discrimination that she based on the direct evidence of King's alleged "stop having kids" statement because it was not tied to any "adverse action"—at the same time he made this comment, he gave Miller the largest raise in her department. Finally, the district court ruled against Miller on her second claim, retaliatory discharge. It held that Miller failed to establish that she engaged in protected conduct at the June 1996 meeting with her supervisors (that she was complaining about pregnancy discrimination), and that in the alternative, Miller did not establish that American Family's reasons for firing her were pretextual.

## II. Discussion

We review the district court's entry of summary judgment *de novo*. *Gleason v. Mesirow Financial, Inc.*, 118 F.3d 1134, 1139 (7th Cir.1997). "Summary judgment is proper if 'there is no genuine issue as to any material fact and … the moving party is entitled to judgment as a matter of law.'" *Id.* (quoting Fed.R.Civ.P. 56(c)). All evidence, and the reasonable inferences to be drawn therefrom, are to be viewed in the light most favorable to the nonmovant. *Rabinovitz v. Pena*, 89 F.3d 482, 486 (7th Cir.1996). But the nonmovant still must produce evidence to establish those elements of her claim on which she bears the burden of proof at trial. *Gleason*, 118 F.3d at 1139. This means that the nonmovant "must do more than raise a 'meta-

VII. However, she did not pursue this claim

physical doubt' as to the material facts." *Id.* "Rather, she 'must come forward with specific facts showing that there is a *genuine issue for trial.*'" *Id.* (emphasis in original) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

### A. Miller's Pregnancy Discrimination Claim

Title VII of the Civil Rights Act of 1964 made it "an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual or to otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's … sex." 42 U.S.C. § 2000e-2(a). In 1978, Congress amended Title VII's prohibition on sex discrimination to include discrimination on the basis of pregnancy. *See Kennedy v. Schoenberg, Fisher & Newman, Ltd.*, 140 F.3d 716, 722 (7th Cir.1998). This amendment, known as the PDA, provides that "women affected by pregnancy, childbirth, or related medical condition shall be treated the same for all employment-related purposes … as other persons not so affected but similar in their ability or inability to work." 42 U.S.C. § 2000e(k); *see Kennedy*, 140 F.3d at 722. "An unlawful employment practice is established whenever pregnancy is a motivating factor for an adverse employment decision." *Kennedy*, 140 F.3d at 722 (citing 42 U.S.C. § 2000e-2(m)).

### 1. *Miller's pre-December 12, 1995 claim and the statute of limitations.*

The 300–day time period for Miller to file her discrimination claim excluded any alleged discriminatory acts that occurred before December 12, 1995. To get around the statute of limitations, Miller seeks use of the "continuing violation" doctrine, under which a plaintiff may "get relief for a time-barred act by linking it with an act that is within the limitations period." *Speer v. Rand McNally*, 123 F.3d

in the district court.

658, 663 (7th Cir.1997). Miller argues this doctrine applies to her because American Family continued to discriminate against her in terms of her salary after December 12, 1995. As a result, she contends, it engaged in a "continuing violation" within the limitations period which she can link to American Family's pre-December 12, 1995 discrimination to bring this otherwise time-barred activity within the limitations period. *See id.* ("For purposes of the limitations period, courts treat such a combination as one continuous act that ends within the limitations period.").

■ Relying on our decision in *Jones v. Merchants Nat'l Bank & Trust Co.*, 42 F.3d 1054 (7th Cir.1994), the district court rejected Miller's argument. It noted that we have recognized three variations of the "continuing violation" doctrine and put forth the "covert" continuing violation theory as the variant which best fit Miller's case. *Id.* at 1058. Under this variation, "the plaintiff can only realize that she is a victim of discrimination after a series of discrete acts has occurred. The limitations period begins to run when the plaintiff gains such insight." *Id.* But "if the plaintiff knew, or with the exercise of reasonable diligence would have known after each act that it was discriminatory and had harmed her, she must sue over that act within the relevant statute of limitations." *Id.*

The district court noted Miller admitted that by January 1995, she knew she was the lowest-paid person in her unit and suspected it was because of her pregnancies. Miller, by her own account, then directly confronted Ann Knapstein (then her immediate supervisor) with this suspicion. According to Miller, Knapstein responded by "simply turn[ing] around, mad, and slamm[ing] one of the drawers on her desk." The district court reasoned that because Knapstein did not deny Miller's charge, her response (or lack thereof) was ambiguous. If Miller was bothered by that response, she had a duty to exercise reasonable diligence to inquire further whether American Family was in fact discriminating against her. Miller, however, did not do so. Instead, she continued working as if nothing had happened; she did not act at that point and "exercise reasonable diligence to root out an actual answer." Because Miller was alerted to a possible problem at the time of the encounter with Knapstein and yet did nothing, the district court held that Miller could not avail herself of the "continuing violation" theory to bring time-barred activity within the limitations period. *See Jones*, 42 F.3d at 1058.

On appeal, Miller argues that Knapstein's response was not ambiguous, but was clearly a denial that the pregnancies were a problem. We agree with the district court, however, about the ambiguity of Knapstein's response. Knapstein did not say "no" or shake her head negatively. On the one hand Knapstein's reaction could be attributed to her being angry that she got "caught" in alleged discriminatory behavior (a tacit admission of discrimination). On the other hand, it could be attributed to her frustration at what she perceived as Miller's ingratitude—the body language equivalent of "after all I've done for you (promotions, raises, four maternity leaves totaling 30 weeks), this is the thanks I get" (an implicit denial of discrimination). While the latter interpretation may be the more likely one, it is certainly not conclusive that this was the meaning of Knapstein's reaction. In short, Knapstein's reaction was ambiguous, and as a result, Miller should have pressed the issue of the discrimination she apparently suspected. Because she did not, she cannot invoke the "continuing violation" doctrine to save her time-barred claims.

*2. Miller's post-December 11, 1995 claim and the "direct method" of proof.*

■ With respect to Miller's discrimination claims that survive the statute of limitations (those occurring on and after December 12, 1995), "[w]e must determine whether [Miller] presented a question of fact as to whether [American Family]

treated her less favorably because of her pregnanc[ies]." *Marshall v. American Hosp. Ass'n*, 157 F.3d 520, 525 (7th Cir. 1998). There are two ways in which Miller could do so. *Id.*; *see also Kennedy*, 140 F.3d at 722. She could "proceed under the 'mixed motives' or direct method . . . by producing sufficient evidence, either direct or circumstantial, to create a triable issue as to whether pregnancy was a motivating factor in her discharge." *Id.* Alternatively, Miller could avoid summary judgment by using the indirect, burden-shifting approach. *See id.* (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)).

In the district court, Miller employed both methods. Before us, she argues only the direct method. She relies on King's alleged statement of April 16, 1996 ("You just have to stop having kids, and I'll get you up to mid-range in a couple of years.") as direct evidence that American Family violated the PDA from December 12, 1995 until her termination.[5]

■ "When a plaintiff proceeds under the direct proof method, allegedly discriminatory statements are relevant, as the district court correctly recognized, only if they are both made by a decisionmaker and related to the employment decision at issue." *Stopka v. Alliance of American*

*Insurers*, 141 F.3d 681, 688(7th Cir.1998). As we said in *Chambers*, 17 F.3d at 1004, there has to a be a link between the alleged prejudice of the manager and the adverse action at issue:

> Liability under Title VII does not turn on the bigotry of company managers unless that bigotry resulted in injury to the plaintiff. . . . There therefore needs to be a link between an [American Family] manager's alleged prejudice, and the decisions that [Miller] is challenging.

In this case, the district court put this principle succinctly when it noted, "even if King were a bigot, [Miller] cannot make a claim unless his bigotry harmed her."

■ American Family made its decisions on Miller's 1994 and 1995 salaries before King arrived. Thus, even if these salaries were unlawfully low, King could not have been responsible for them. As a result, his April 1996 statement has no probative value for the legality of those earlier salaries. *See Kennedy*, 140 F.3d at 724 ("[E]ven if Goldberg's comment could be viewed as discriminatory, it does not serve as evidence plaintiff was terminated for discriminatory reasons because Goldberg, even though plaintiff's supervisor, was not a decision maker" as to the decision at issue.); *see also Gleason*, 118 F.3d at 1140.[6]

---

**5.** Miller asserts American Family errs in stating that she "is proceeding only on a direct evidence theory to establish pay discrimination." She argues that she has identified more than the direct evidence of King's alleged statement. It appears Miller is confusing the direct method, under which a plaintiff may use both direct and circumstantial evidence to establish discriminatory motive, with the indirect method, under which she must establish a prima facie case. *See Marshall*, 157 F.3d at 525. Miller does not lucidly develop her direct method theory with circumstantial evidence (her argument revolves around the direct evidence of King's alleged statement). *See Chambers v. American Trans Air, Inc.*, 17 F.3d 998, 1005 (7th Cir.1994) (Undeveloped arguments are waived. "[W]e will not reverse the entry of summary judgment based on skeletal snippets of argument . . . ."). And if Miller is instead disputing that she has abandoned the indirect method, her protest is to no avail, for she has not dis-

cussed it in her initial brief in any cognizable fashion, such as by demonstrating how she has made a prima facie case. *See id.*

**6.** Although we will assume King's alleged statement qualifies as direct evidence, there is a question whether it does. "To rise to the level of direct evidence of discrimination, this Court has stated that 'isolated comments must be contemporaneous with the [adverse action] or causally related to the [applicable] decision making process.' " *Kennedy*, 140 F.3d at 723 (quoting *Geier v. Medtronic Inc.*, 99 F.3d 238, 242 (7th Cir.1996)); *see also Marshall*, 157 F.3d at 526. Here, King's statement is neither. There was no adverse action to which the statement was tied: King gave Miller the biggest raise in her department when he made the remark. And it was not causally related to the applicable decision-making process: the statement refers to *future* compensation decisions, not to the April 1996 one that had already been made.

■ That leaves only two compensation decisions for which King was responsible: Miller's April 16, 1996 raise (when he made the "not having kids" remark) and his July 1996 refusal to give her an even bigger raise. As to the first, Miller's counsel acknowledged at oral argument that Miller did not advise her supervisors that she was pregnant with her latest child until mid-May, one month *after* King told her about her raise. Her claim of pregnancy discrimination with respect to her April 1996 raise cannot be based on her *being* pregnant if King did not know she was. It must, instead, be predicated on a more general displeasure with women who have missed work because of past pregnancies. Given that American Family is 64% female and its employees frequently take maternity leaves (indeed, Miller took four, totaling 30 weeks), we are skeptical the evidence would support the existence of such a claim.

■ But even if it would have, Miller's April 1996 raise was the biggest in her unit. King cannot be guilty of pregnancy discrimination—of treating Miller less favorably than her heretofore-non-pregnant co-workers—by giving her a raise that was bigger than the raises he gave all her non-pregnant colleagues. As the district court put it, "even if [King's] statement is evidence of discriminatory motive, the job action to which the comment was tied was not adverse; concurrently with the comment, [Miller] received the largest [raise] of any employee in the department." This is fatal to Miller's claim, for without a materially adverse job action, discrimination is not actionable. *See Rabinovitz*, 89 F.3d at 488; *see also Chambers*, 17 F.3d at 1004 ("Liability under Title VII does not turn on the bigotry of company managers unless that bigotry resulted in injury to the plaintiff.").

■ What remains, then, is Miller's argument that King discriminated against her by not agreeing to her July 1996 demand for even more money. The district court also rejected this argument, observing that "not everything that makes an employee unhappy is an actionable adverse action." *Smart v. Ball State University*, 89 F.3d 437, 441 (7th Cir.1996). It noted that in *Rabinovitz*, we held that the "loss of a bonus is not an adverse employment action in a case ... where the employee is not automatically entitled to the bonus," 89 F.3d at 488–89, and that here, Miller has not argued that she was "automatically entitled to an even larger raise." It reasoned that this case was in line with *Rabinovitz*: "If, absent entitlement, failure to receive any bonus or [raise] is not a material adverse job action, it follows that King's discretionary decision to award plaintiff the largest [raise] in her department[, but not to give her the even larger raise she demanded,] cannot be a material adverse job action.... whatever [King's] personal beliefs." We find the district court's reasoning entirely sound.

■ Miller similarly complains that King's *failure to make a good faith effort* to obtain more funds from which to give her an even bigger raise (allegedly because of his anti-pregnancy bias) is an adverse action. After meeting with Miller on June 27, 1996, King spoke with the Human Resources Division about obtaining more funds for Miller but did not press his inquiry. We do not find it remarkable, however, that King did not vigorously try to obtain more money for Miller after their meeting. She had just finished calling him—her supervisor—incompetent and a political hack, and she did so in the presence of *his* supervisor (whom she also called incompetent) before threatening to quit if she did not get her way. Given Miller's unusual strategy, it is surprising that King made any effort to garner more funds.

Nevertheless he did, and we do not fault American Family for King's efforts, even if he did not go to the mat for Miller. King had a limited pool of money from which to award raises. From this limited pool, he gave Miller the largest raise in her unit. Then, after she threatened to quit and personally insulted him, he still made an

effort (albeit a relatively minor one) to obtain even more money for her.[7] Under company procedures, King would then have had to have gone to his Vice–President to obtain more money for Miller, no doubt requiring an extraordinary request for a subordinate who had just insulted him in front of his boss. Under these circumstances, not taking that extra step was not an adverse action. *See Rabinovitz*, 89 F.3d at 488–489, *supra*.[8]

## B. Miller's Retaliation Claim

 Title VII protects persons not just from certain forms of job discrimination, but from retaliation for complaining about the types of discrimination it prohibits. *Dey v. Colt Const. & Dev. Co.*, 28 F.3d 1446, 1457 (7th Cir.1994) (citing 42 U.S.C. § 2000e–3(a)). Miller also argues that American Family violated Title VII by firing her in retaliation for complaining about alleged pregnancy discrimination. She does not have direct evidence that it did so, so she proceeds under the *McDonnell Douglas* burden-shifting variant applicable to claims of retaliation. *See Dey*, 28 F.3d at 1457. To establish a prima facie case of retaliation under it, Miller must show that (1) she engaged in statutorily protected expression by complaining about discrimination that Title VII covers; (2) she suffered an adverse action by her employer; and (3) there is a causal link between the protected expression and the adverse job action. *Id.* If Miller establishes these elements, then American Family has the burden to produce a legitimate (non-discriminatory) reason for firing her. *Id.* If it succeeds in doing so, then Miller has the burden to prove that American Family's

proffered reasons were not true—that they were a mere pretext for retaliating against her. *Id.*

### 1. Miller's prima facie case.

 The district court concluded that Miller did not engage in protected expression during her June 1996 meeting with Knapstein and King. The court noted two occasions when Miller did ostensibly discuss pregnancy discrimination—her January 1995 query to Knapstein and King's alleged comment to her in April 1996. The court concluded these events were not sufficiently connected to her termination; they would not support a reasonable inference that American Family fired her after the June meeting because Knapstein and King knew she was complaining about pregnancy discrimination at that meeting. Before us, Miller points to these two instances, as well as other events (so called "background facts"), and contends the district court impermissibly made credibility determinations by believing King and Knapstein that they did not know Miller was complaining about pregnancy discrimination at that meeting, while not believing her that they did know. Given these "background facts," Miller contends, a jury could reasonably infer that her supervisors really knew that her complaints at that meeting "centered around" her belief of pregnancy discrimination.

 An employee, of course, need not use the words "pregnancy discrimination" to bring her speech within Title VII's retaliation protections. *See Drake v. Minnesota Mining & Mfg. Co.*, 134 F.3d 878, 882, 885 (7th Cir.1998). But she has

---

7. King's effort to obtain more money for Miller after her insult indicates he in fact did not have an anti-pregnancy bias. *See Gleason*, 118 F.3d at 1141 (emphasis in original) ("In reviewing a ... grant of summary judgment, we must evaluate the record 'as a whole.' Therefore, in addition to the supposed 'evidence' of pregnancy discrimination cited by [plaintiff], ... we must also consider any facts in the record which serve to establish that her employer was *not* biased against pregnant women ....").

8. American Family also contends that, if anything, King's alleged statement reflected a negative attitude toward Miller's absences from work due to her maternity leaves and vacations (which the PDA would not cover), rather than a discriminatory attitude towards her pregnancies (which the PDA would cover). *Geier*, 99 F.3d at 242. Because we hold that American Family's compensation decisions were not "adverse actions," we need not address this argument.

to at least say something to indicate her pregnancy is an issue. An employee can honestly believe she is the object of discrimination, but if she never mentions it, a claim of retaliation is not implicated, for an employer cannot retaliate when it is unaware of any complaints. *Cf. Dey*, 28 F.3d at 1458 ("We agree that there generally can be no causal link between protected activity and an adverse employment action if the employer remained unaware of the protected activity.").

Here, the district court did not err in holding that Miller did not engage in protected expression at the June 1996 meeting. She said nothing to indicate that pregnancy discrimination was an issue. Her own copious notes (which she testified are a complete and accurate account of that meeting) plainly show that she did not mention pregnancy or even related topics such as children or maternity leave. Her complaints instead concerned a *general* displeasure with being paid less than her co-workers given her longer tenure and the fact that she had trained some of them. She also complained that a co-worker who was the subject of dozens of complaints was the highest-paid person in the unit. By complaining about matters *other* than her pregnancies, Miller, if anything, implied that pregnancy was not a factor in American Family's decisions.

Miller's "background facts" include things like her taking maternity leave in 1989, 1991, 1994, and 1995. That is accurate history but has nothing to do with the June meeting with King and Knapstein. Miller has not produced "evidence from which it could *reasonably* be inferred that [her employer] *more likely than not*" knew she was concerned about pregnancy discrimination. *Senner v. Northcentral Technical College*, 113 F.3d 750, 758 (7th Cir. 1997) (emphasis in original); *see also Dey*,

28 F.3d at 1459 n. 12. Indeed, as the district court noted, "[i]t is undisputed that [Miller] did not engage in statutorily protected expression at any time before or after January 1995, a year and a half prior to her termination. [And] [f]ollowing her remarks to Knapstein in 1995 she worked for a year and a half in apparent harmony with her supervisors and was given the largest [raise] in her department."

In sum, the district court did not invade the jury's province to assess credibility. Rather, it correctly concluded that Miller had failed to produce evidence from which a jury could reasonably and more likely than not infer knowledge on the part of her supervisors. *See id.* at 758; *Dey*, 28 F.3d at 1459 n. 12.[9]

### 2. *Miller's assertion that American Family's reasons were pretextual.*

■ Even if Miller had established her prima facie case of retaliation, American Family would still be entitled to summary judgment because it presented legitimate, non-discriminatory reasons for firing her, and Miller did not meet her burden of showing that these reasons were pretextual. *See Richter v. Hook–SupeRx, Inc.*, 142 F.3d 1024, 1029 (7th Cir.1998) (when employer articulates legitimate reasons for terminating employee, burden shifts to employee to establish that the proffered reasons were phony). "Pretext" is "more than a mistake on the part of the employer; pretext 'means a lie, specifically a phony reason for some action.'" *Id.* at 1030 (quoting *Wolf v. Buss (America) Inc.*, 77 F.3d 914, 919 (7th Cir.1996)). Thus, "[t]he issue of pretext does not address the correctness or desirability of [the] reasons offered for employment decisions. Rather, it addresses the issue of whether the em-

**9.** Miller's subjective belief that her supervisors knew her complaints at the June meeting "centered around" her belief of pregnancy discrimination, by itself, will not create the factual dispute needed to ward off summary judgment. This bare assertion simply speculates as to what her supervisors knew, and

for the reasons just discussed, it is not reasonable to impute such knowledge to them. *See* Fed.R.Civ.P. 56(e); *Adusumilli*, 164 F.3d at 359–360 (affirming striking, as speculation, portion of employee's affidavit attesting to supervisors' alleged knowledge because it was not reasonable to impute knowledge to them).

ployer honestly believes in the reasons it offers." *Id.* at 1029.

American Family's reasons for firing Miller were (1) her "raise-or-quit" ultimatum was inappropriate; (2) its concern that Miller would not be a "team player" in the future, given her views about her supervisors' competence and her file on a co-worker; (3) its fear that Miller lacked commitment to the company, given her statements about leaving; and (4) its belief that Miller was unhappy because she was not getting paid what she felt she deserved and would leave soon anyway on her own terms.

Miller argues her "raise or quit" ultimatum was not inappropriate. According to her, this is not simply a threat to leave; rather, it is a "threat to leave if you do not stop discriminating against me." Of course, Miller never *said* (or even implied) that American Family was engaging in pregnancy discrimination. Instead she called her immediate supervisor incompetent and a political hack, and called his supervisor incompetent. Miller had a right to engage in protected conduct without fear of retaliation, but when she says something obviously inappropriate and unprotected, she is not insulated from being fired. Because she did not prove some pretext, American Family's "inappropriate ultimatum" reason easily holds up. *Gleason,* 118 F.3d at 1143 ("In the summary judgment context, the ultimate burden is on the plaintiff to show that there is some genuine issue of fact as to whether the stated reasons form a pretext for ... discrimination.").

Nor did Miller overcome American Family's other reasons—that she would not be able to be a "team player" in the future, that she projected a lack of commitment, and that she would be unhappy working with her supervisors and co-workers. True, her work had been good in the past and her supervisors were not concerned with her ability to continue to produce quality work. But someone who keeps a file on a co-worker and trashes her supervisors can reasonably be labeled something other than a team player. As to her lack of commitment, Miller *thrice* threatened to leave the company. And her second threat was really a promise—"then I *will* be leaving the company ...." Her third threat only partly retracted (but still confirmed) this promise: Miller clarified that she would not be leaving "in the *near future.*" As the district court noted, it "is not discriminatory for an employer to take preemptive action against an employee who has announced her intention to leave at the first opportunity." Lastly, based on Miller's repeated threats to quit, it is reasonable to conclude that American Family sincerely believed she was unhappy at the company, and therefore it was in its best interest to terminate her before she left on her own terms. *Gleason,* 118 F.3d at 1142 (employer is entitled to make "reasoned business judgment about whether to continue" to employ plaintiff).[10]

### III. Conclusion

American Family readily acknowledges that Miller was a good employee. Perhaps she should have been paid more, but it is nevertheless undisputed that American Family was making progress in eliminating the pay disparity between Miller and her colleagues. In a few years, this disparity may well have been eliminated. Instead of waiting (or reaping the benefits of "salary compression" elsewhere), Miller got angry and "gave [her employer] ample nondiscriminatory reasons to terminate her." As the district court observed,"[t]hat she found she could not quit on her own terms does not mean that she

---

10. Miller disputes American Family's contention that she has abandoned her claim that it fired her for being pregnant. She concedes, though, that this claim rises or falls with the resolution of the pretext analysis on her claim that America Family fired her for complaining about discrimination. Because we affirm the district court's ruling that American Family did not fire Miller for complaining about pregnancy discrimination, we need not address her claim that it fired her for being pregnant.

can escape the consequences [of her actions]."

The judgment of the district court is AFFIRMED.