In the
United States Court of Appeals
For the Seventh Circuit

No. 99-1092

Cheryl K. McPhaul,

Plaintiff-Appellant,

v.

Board of Commissioners of Madison County,
Indiana, Arleen Horine, in her official and
individual capacity, and Madison County
Board of Health,

Defendants-Appellees.

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 97 C 97--Sarah Evans Barker, Chief Judge.

Argued February 18, 2000--Decided August 16, 2000

Before Bauer, Posner, and Manion, Circuit Judges.

Manion, Circuit Judge.  Cheryl McPhaul sued her
former employer, the Madison County Board of
Commissioners, alleging that the County failed to
accommodate her disability in violation of the
Americans with Disabilities Act (ADA). She also
brought an individual capacity suit, under 42
U.S.C. sec. 1983, against her former supervisor,
Arleen Horine, alleging that Horine discriminated
against her because of her race, in violation of
the Equal Protection Clause of the Fourteenth
Amendment. The defendants moved for summary
judgment. The district court granted the motion,
concluding that McPhaul failed to establish a
prima facie case for her ADA and section 1983
claims. McPhaul appeals, and we affirm.

I.

   Cheryl McPhaul is a black woman who worked as a
registered nurse for the Women, Infants and
Children (WIC) program in Madison County,
Indiana. WIC is a federally-funded program that
provides health care and nutrition assistance for
pregnant women, infants and children. McPhaul's
supervisor was Arleen Horine, a registered nurse
who coordinates the WIC program in Madison
County.

McPhaul began working for WIC as a nurse nutritionist in April of 1994, where her responsibilities included counseling WIC clients about nutrition and certifying them for program benefits like food supplements. In May 1995, Horine concluded that McPhaul's performance as a nutritionist was deficient because she was writing the same information on the charts of WIC clients regardless of their varying situations, including the infants, a practice that Horine described as "totally inappropriate." Thus, Horine transferred McPhaul to the position of intake clerk in May 1995. Intake clerks certify clients for the WIC program in order to secure federal funding. They record the heights and weights of clients so that the nurse nutritionists can properly advise clients about their diets. As an intake clerk, McPhaul continued to receive the same benefits and pay that she received as a nutritionist.

In September 1995, McPhaul received her first performance evaluation as an intake clerk, in which Horine rated her performance "Below Average," the second lowest rating on a scale of five. Horine's evaluation states that McPhaul was having "great difficulty in doing her job," that she was making "gross errors" in charting the heights and weights of clients, and that she was having trouble remembering shot schedules for infants and children and how to certify clients. Although McPhaul was retrained after her initial evaluation, she fared no better on her second evaluation in November 1995. According to Horine's notes, McPhaul's performance was still "Below Average" because she continued to make "gross errors" in plotting the heights and weights of clients, and was still unable to understand the certification process. In January 1996, Horine completed McPhaul's third (and last) performance review, in which McPhaul received the lowest possible rating of "Unsatisfactory." Horine stated that McPhaul was making "numerous errors" in the routine tasks of the job, and that she was still failing to accurately record the heights, weights, and even the ages of clients. Horine recommended to the WIC administrator that McPhaul should be discharged. The administrator and the Health Officer approved Horine's recommendation, and McPhaul was terminated on January 22, 1996.

After her termination, McPhaul sued the Board of Commissioners, alleging that she was disabled and that the Board failed to accommodate her disability, in violation of the ADA. She also sued Horine in her individual capacity, under section 1983, alleging that Horine discriminated against her because of her race, thus affecting

the terms and conditions of her employment. McPhaul also claimed that Horine failed to protect her from an alleged campaign of racial harassment by her white co-worker, Marcia Shock.

Concerning her ADA action, McPhaul claims that she had been suffering from fibromyalgia since February 1995 (before Horine transferred her from the nutritionist position to the intake clerk position in May 1995). Fibromyalgia is a disease that is similar to chronic fatigue syndrome; its cause is unknown, there is no cure, and the symptoms are entirely subjective and usually involve chronic pain and fatigue. McPhaul's fibromyalgia symptoms included fatigue, insomnia, shortness of breath and muscle pain, including sore hands and joints. She claims that her condition made it difficult for her to concentrate, bathe, walk, write and work, and that in September 1995 she requested Horine to accommodate her alleged disability by allowing her to arrive at work one hour later or to leave one hour earlier, or both. According to McPhaul, her request was denied. Horine claims that McPhaul never made the request.

On January 11, 1996, McPhaul saw Dr. Van Dellen at the Mayo Clinic. He concluded that it was "possible" that McPhaul had fibromyalgia, and he gave her a card that instructed her to participate in an education program about the disease. McPhaul allegedly presented the card to Horine, but Horine asserts that she was never informed of McPhaul's disease. McPhaul was not diagnosed with fibromyalgia until February 1, 1996, several days after she was terminated.

McPhaul's disparate treatment claim under section 1983 is based on several allegations that Horine discriminated against her because of her race by demoting her to the intake clerk position, terminating her from that position, and by treating her differently in regards to other terms and conditions of her employment. Horine disputes these allegations.

In support of her hostile environment claim under section 1983, McPhaul alleges that she was harassed by Shock's discussion of racially sensitive subjects and her repeated use of the word "nigger" in McPhaul's presence. McPhaul also alleges that Horine knew about and tolerated Shock's conduct, and is thus liable in her individual capacity. Horine disputes these allegations as well.

The defendants moved for summary judgment, arguing that McPhaul failed to establish a prima facie case to support her claim under the ADA, or to support her disparate treatment and hostile

environment claims under section 1983. The district court granted the motion, concluding that McPhaul's ADA claim failed because she did not present sufficient evidence that she was disabled; that her disparate treatment claim failed because she presented no evidence that Horine was motivated by discriminatory intent; and that her hostile environment claim failed because she produced no evidence that her work environment was objectively hostile, or that Horine knew or consented to Shock's conduct.

"We review the district court's entry of summary judgment de novo," Miller v. American Family Mut. Ins. Co., 203 F.3d 997, 1003 (7th Cir. 2000), and we will view all of the facts and draw all reasonable inferences in favor of the nonmoving party. See id. Summary judgment is proper if the evidence shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). McPhaul cannot merely allege the existence of a factual dispute to defeat summary judgment. Skorup v. Modern Door Corp., 153 F.3d 512, 514 (7th Cir. 1998). She must supply evidence sufficient to allow a jury to render a verdict in her favor. Ross v. Indiana State Teacher's Association, 159 F.3d 1001, 1012 (7th Cir. 1998).

II.
A.  The ADA Claim

McPhaul's first argument on appeal is that the district court erred in concluding that her reasonable accommodation claim fails because she was not disabled under the ADA. The ADA proscribes discrimination "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, . . . and other terms, conditions and privileges of employment." 42 U.S.C. sec. 12112(a). The Act also provides that an employer discriminates against a qualified individual with a disability by "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . ." 42 U.S.C. sec. 12112(b)(5)(A). To establish a prima facie case for failure to accommodate under the ADA, McPhaul must show that: (1) she was disabled; (2) the Board was aware of her disability; and (3) she was a qualified individual who, with or without reasonable accommodation, could perform the essential functions of the employment position. Feldman v. American Memorial Life Ins. Co., 196 F.3d 783, 789 (7th Cir. 1999). Although the district court held that McPhaul failed to establish that she was disabled, we reserve

opinion on that determination because we find it dispositive that McPhaul has failed to present sufficient evidence to show that she was a "qualified individual" under the ADA. See id.

A "qualified individual with a disability" is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. sec. 12111(8). McPhaul has the burden of proof on this issue, as she must show that she could perform the essential functions of the nutritionist and intake clerk jobs either with or without a reasonable accommodation. Bultemeyer v. Fort Wayne Community Schools, 100 F.3d 1281, 1284 (7th Cir. 1996); 29 C.F.R. sec. 1630.2(m).

The evidence clearly demonstrates that McPhaul was not able to perform the essential functions of the nutritionist and intake clerk positions. Horine concluded that McPhaul's performance as a nutritionist was deficient because she was recording the same information on the charts of all of her patients, regardless of the various facts each presented, including the infants. For obvious reasons, Horine described this practice as "totally inappropriate." McPhaul does not dispute Horine's conclusion. Moreover, McPhaul does not dispute Horine's three evaluations that thoroughly documented McPhaul's performance deficiencies as an intake clerk.[1] And McPhaul presents no medical evidence to show that her performance deficiencies at either job were due to her alleged disability of fibromyalgia.

McPhaul responds by claiming that she would have been able to perform the essential functions of the nutritionist and intake clerk jobs if Horine accommodated her request to arrive at work one hour later, or to leave one hour earlier. Aside from the fact that Horine claims that McPhaul never requested reduced hours, McPhaul provides no medical evidence to support her claim that her requested accommodation would have improved her performance, as none of her physicians ever recommended any work restrictions or accommodations due to her condition.[2] All that McPhaul can present in support of her reasonable accommodation claim is her own self-serving testimony, and in this case, that is just not sufficient for a reasonable jury to find that she is a qualified individual with a disability under the ADA. See Slowiak v. Land O'Lakes, Inc., 987 F.2d 1293, 1295 ("Self-serving affidavits without factual support in the record will not defeat a motion for summary judgment."). Therefore, McPhaul's ADA claim fails.

B.  The Section 1983 Claims

McPhaul also argues that Horine is personally liable for discriminating against her because of her race, in violation of the Equal Protection Clause of the Fourteenth Amendment and 42 U.S.C. sec. 1983. According to McPhaul, Horine treated her differently regarding the terms and conditions of her employment, and failed to act to stop Shock's alleged campaign of racial harassment.

To state a prima facie case under the Equal Protection Clause of the Fourteenth Amendment, a plaintiff must demonstrate that she: (1) is a member of a protected class; (2) is otherwise similarly situated to members of the unprotected class; (3) suffered an adverse employment action; (4) was treated differently from members of the unprotected class; and (5) the defendant acted with discriminatory intent. Greer v. Amesqua, 212 F.3d 358, 370 (7th Cir. 2000); Jackson v. City of Columbus, 194 F.3d 737, 751-52 (6th Cir. 1999). Regarding the fifth element, McPhaul must show that Horine "acted [or failed to act] with a nefarious discriminatory purpose," and discriminated against McPhaul because of her membership in a definable class (because she is black). Nabozny v. Podlesny, 92 F.3d 446, 453 (7th Cir. 1996) (internal citations omitted).

1. Disparate treatment.

McPhaul first contends that Horine discriminated against her because of her race by treating her differently in regards to the terms and conditions of her employment by: (1) transferring her to the intake clerk position; (2) terminating her from that position; (3) neglecting to train her for the intake clerk position while Shock, a white intake clerk, received more sufficient training; (4) denying her request to work reduced hours while granting Shock's request for the same accommodation; (5) requiring her to see more clients than Shock; and (6) prohibiting her from wearing a nurse's uniform while allowing Shock to wear one.

McPhaul's claims regarding her transfer and termination clearly fail because she does not establish the second and fifth elements of a prima facie case. She does not establish the second element--that she was otherwise similarly situated to other nutritionists or intake clerks who are members of an unprotected class--because she does not identify any co-worker with a similar "Below Average" or "Unsatisfactory" performance rating./3 See O'Connor v. Chicago Transit Authority, 985 F.2d 1362, 1371 (7th Cir. 1993) ("To make a prima facie case, O'Connor

would have to show that another grossly insubordinate worker was treated better than him.") (citation omitted). And because McPhaul presents no evidence to indicate that Horine's transfer and termination decisions were motivated by any reason other than McPhaul's performance deficiencies (which are undisputed), she clearly fails to show that Horine's decisions were motivated by racial animus. Nabozny, 92 F.3d at 453.

On her claim about inadequate training, McPhaul essentially argues that Horine set her up for failure by neglecting to prepare her for the intake clerk position while Horine ensured that Shock was well prepared before she started the job. Horine disputes McPhaul's claim, and the record contains no evidence that Shock received better (or more timely) preparation for the position. See Slowiak, 987 F.2d at 1295. Moreover, McPhaul does not dispute Horine's notes that McPhaul was "retrained fully for the job" after her first evaluation, but her performance still deteriorated to the "Unsatisfactory" level. Because the record discredits McPhaul's argument, and she presents no evidence that Horine acted with racial animus, this claim fails.

McPhaul's next contention is that Horine discriminated against her when she allegedly denied her request to work a reduced schedule, but granted Shock's request for the same accommodation. According to McPhaul, Horine's reason for denying her request was that she already reduced hours for Shock and could not grant the same favor to McPhaul./4 But McPhaul's actual testimony was that Shock's time away from work "varied," and not that she was regularly allowed to work a reduced schedule, which corroborates Horine's testimony that Shock never requested a reduced schedule, but occasionally took sick leave and vacation days. McPhaul presents no evidence to dispute that Shock used her accrued sick or vacation time when Horine allowed her to take a portion of a day off. And the record demonstrates that by January 1996, McPhaul had used all of her vacation and sick time. Nevertheless, Horine's decision to allow Shock to take accrued leave, and not to allow McPhaul to take leave that had not been accrued, does not evince that Horine was motivated by a "nefarious discriminatory purpose," and this claim fails./5

McPhaul also contends that Horine required her to see more WIC clients than Shock on a daily basis. In support of her contention, McPhaul relies solely on her own observations through a window to Shock's office, and fails to challenge the scheduling book in the record that

demonstrates that the WIC receptionist distributed WIC clients equally to McPhaul and Shock. Thus, McPhaul provides no evidence that Horine intentionally assigned more clients to McPhaul, or did so because of her race.

McPhaul's last claimed instance of disparate treatment is that Horine prohibited her from wearing a nursing uniform while she allowed Shock to wear one. According to McPhaul, Horine told her not to wear a uniform because WIC clients feel more comfortable when WIC staff are dressed in casual clothes. McPhaul does not indicate that she requested to wear a uniform, or that she was ever punished for wearing a uniform, or that she ever asked why Shock was apparently allowed to wear a uniform. The uniform was not a factor in her transfer or her termination, and there is no evidence that the uniform was an important issue at WIC. McPhaul just does not show that Horine's policy on uniforms was an adverse employment action. See Southard v. Texas Bd. of Criminal Justice, 114 F.3d 539, 555 (5th Cir. 1997) ("Not every negative employment decision or event is an adverse employment action that can give rise to a discrimination or retaliation cause of action under section 1983."); see also Silk v. City of Chicago, 194 F.3d 788, 800 (7th Cir. 1999). McPhaul also provides no evidence that Horine's policy was motivated by racial animus.

We conclude that McPhaul's claimed instances of discrimination (considered individually and collectively) do not constitute sufficient evidence for a reasonable jury to conclude that Horine discriminated against her because of her race. Thus, McPhaul's disparate treatment claim fails.

2. Hostile environment.

McPhaul also contends that Horine is personally liable for failing to act to stop Shock's alleged campaign of racial harassment. McPhaul does not allege any harassment by Horine, but that Shock, her co-worker, harassed her by making racially sensitive and derogatory remarks in her presence while Horine failed to intervene to rectify the situation.

To establish an individual capacity claim under section 1983 against a supervisory official, there must be a showing that the official was directly responsible for the improper conduct, Wolf-Lillie v. Sonquist, 699 F.2d 864, 869 (7th Cir. 1983), and "knowingly, willfully, or at least recklessly caused the alleged deprivation by [her] action or failure to act." Rascon v. Hardiman, 803 F.2d 269, 274 (7th Cir. 1986).

However:

[A] defendant's direct participation in the deprivation is not required. An official satisfies the personal responsibility requirement of section 1983 if she acts or fails to act with a deliberate or reckless disregard of plaintiff's constitutional rights, or if the conduct causing the constitutional deprivation occurs at her direction or with her knowledge and consent.
Id. (quoting Smith v. Rowe, 761 F.2d 360, 369 (7th Cir. 1985)). The plaintiff must also show that the supervisor acted (or failed to act) because of the plaintiff's race. See Nabozny, 92 F.3d at 453.

To prevail on a hostile environment racial harassment claim, the plaintiff must also show that her work environment was both subjectively and objectively hostile./6 See Adusumilli v. City of Chicago, 164 F.3d 353, 361 (7th Cir. 1998) (citing Harris v. Forklift Systems, 510 U.S. 17, 21 (1993)).

An objectively hostile environment is one that a reasonable person would find hostile or abusive. [Harris, 510 U.S. at 21]. In determining whether a plaintiff has met this standard, courts must consider all the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it was physically threatening or humiliating; or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." [Id. at 23].

Adusumilli, 164 F.3d at 361. We shall evaluate McPhaul's claims according to these standards.

McPhaul alleges that Shock harassed her by discussing racially sensitive subjects and by repeatedly using the racial epithet "nigger" in McPhaul's presence. Although McPhaul alleges that Shock's comments occurred on a weekly basis, she presents three specific instances on appeal. In the first instance, Shock repeated to McPhaul a comment (made to Shock by a WIC client) that Horine looked like "a little nigger lady." The second instance involved Shock calling McPhaul's attention to the fact that a client was a dark-skinned mother who had a lighter-skinned baby. And lastly, Shock told McPhaul that Shock's family was once harassed by the Ku Klux Klan. According to McPhaul, she complained to Horine about Shock's derogatory and racially insensitive remarks, and that Horine advised her to "ignore it." But McPhaul also admitted that Horine later separated her from Shock by moving her to her own office. Horine testified that McPhaul never complained to her about Shock's alleged harassment, and that she never witnessed Shock using the word "nigger."

We first consider whether Shock's remarks created an objectively hostile environment for McPhaul. Shock allegedly used the word "nigger" when she repeated a comment made by a WIC client about Horine,/7 and thus Shock did not direct that epithet at McPhaul or anyone else. When such harassment is directed at someone other than the plaintiff, the "impact of [such] 'second hand harassment' is obviously not as great as the impact of harassment directed at the plaintiff." Gleason v. Mesirow Financial, Inc., 118 F.3d 1134, 1144 (7th Cir. 1997). Although McPhaul also alleges that Shock used the word "nigger" on a weekly basis, she never claims that Shock directed it at McPhaul or anyone else, which indicates that Shock tended to repeat the epithet out of her own immaturity and insensitivity, rather than racial animus. Moreover, McPhaul stated twice in her deposition that she considered Shock's remarks (especially her use of the word "nigger") to be "offensive," but she never claimed that they interfered with her work performance, or were physically threatening or humiliating. Thus, the "mere utterance of an . . . epithet which engenders offensive feelings in an employee" is not sufficient to establish a hostile working environment. Harris, 510 U.S. at 21 (quoting Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 67 (1985)).

Shock's comment about the child's skin color was understandably offensive to McPhaul, but it was not about McPhaul, and merely demonstrates Shock's ignorance of the probable consequences of her careless chatter rather than racial hostility. And Shock's claim that the Ku Klux Klan once harassed her family does not implicate any hostile intent. We conclude, therefore, that McPhaul fails to present sufficient evidence to support a reasonable inference that Shock's remarks created an objectively hostile working environment. See Adusumilli, 164 F.3d at 361.

Moreover, there is insufficient evidence to indicate that Horine deliberately or recklessly intended or allowed Shock's alleged conduct, or that Horine failed to act because she was motivated by racial animus against McPhaul. The record does not indicate that Horine intended or directed any of Shock's comments, as they appear to have involved Shock's spontaneous (and inconsiderate) reactions to what she had observed or heard. And McPhaul admits that Shock's comments decreased after Horine gave McPhaul her own office. Therefore, McPhaul presents insufficient evidence to indicate that Horine was responsible for Shock's alleged campaign of harassment, and the hostile environment claim fails./8

We conclude that McPhaul has failed to establish a prima facie case under the ADA because she is not a qualified individual with a disability. She has also failed to establish a prima facie case under section 1983 because she has not made a sufficient showing that Horine discriminated against her because of her race. Accordingly, We AFFIRM the district court.

/1 While McPhaul does not dispute her performance evaluations directly, she does claim that Horine failed to sufficiently train her for the intake clerk position, and required her to see more clients than other intake clerks. But as we explain in our analysis of McPhaul's disparate treatment claim, she fails to present any evidence to support these allegations, and the record actually discredits them.

/2 The record does contain, however, a January 17, 1996 note from Dr. Van Dellen of the Mayo Clinic that simply states that McPhaul "could return to work January 15, 1996." There is no indication of any work restrictions or of any need for a work accommodation.

/3 McPhaul only identifies Marcia Shock, a white intake clerk, as a member of an unprotected class who was allegedly treated more favorably by Horine. But Shock was not similarly situated to McPhaul because Horine rated Shock's performance as "Average," which is a superior rating to McPhaul's "Below Average" and "Unsatisfactory" ratings. McPhaul does not challenge Horine's performance evaluations. Also, at the time of her discharge, McPhaul was paid over $14.00 per hour while Shock was paid $11.00 per hour.

/4 Horine claims that neither McPhaul nor Shock made such a request, and thus no such accommodation was granted at all. We note that even if Horine did grant Shock's request on a first come, first served basis, that would be a legitimate business decision that is beyond our purview. See McCoy v. WGN Continental Broadcasting Co., 957 F.2d 368, 373 (7th Cir. 1992) (this court does not sit as a super personnel department to review an employer's business decisions).

/5 And we have already established that McPhaul provided no medical evidence to support her request for a reduced schedule, and thus Horine had no compelling reason to grant it.

/6 Because section 1983 claims generally follow "the contours of Title VII claims," we will apply the same "hostile environment" standard that is

applied in Title VII cases. King v. Board of Regents of University of Wisconsin System, 898 F.2d 533, 537 (7th Cir. 1990).

/7 Horine is white.

/8 McPhaul also argues that we must consider Horine's alleged failure to protect her from Shock's offensive remarks as further evidence of McPhaul's disparate treatment claim. Because we conclude that no reasonable jury could find that Shock's remarks created an objectively hostile environment, or that Horine was somehow motivated by racial animus to endorse them, our consideration of these allegations (individually, and collectively with the other six alleged instances of disparate treatment) does not change our conclusion that McPhaul's disparate treatment claim fails.