# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 04-3442

MELODY J. CULVER,

*Plaintiff-Appellant,*

v.

GORMAN & COMPANY,

*Defendant-Appellee.*

———————

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 00 C 7620—**Barbara B. Crabb**, *Chief Judge.*

———————

ARGUED JUNE 3, 2005—DECIDED JULY 20, 2005

———————

Before CUDAHY, POSNER, and WILLIAMS, *Circuit Judges.*

CUDAHY, *Circuit Judge.* If, as Martin Luther King, Jr., once stated, discrimination is a "hellhound," then a retaliation lawsuit is a plaintiff's opportunity to bite back.[1] Melody Culver was terminated by her employer, Gorman & Company, on January 10, 2002, three days after she spoke of filing a discrimination charge or seeing a lawyer. She then brought suit, claiming retaliation in violation of Title VII and the Equal Pay Act. Gorman filed a motion for

---

[1] Dr. Martin Luther King, Jr., Address at the Southern Christian Leadership Conference, Atlanta, Georgia (August 16, 1967).

summary judgment, and the district court granted it, stating that the suspicious timing of Culver's termination by itself did not create a triable issue and that Gorman had advanced lawful reasons for terminating her for insubordination between January 7 and 10. Culver appeals. Because Culver has shown that discrimination may have been a substantial or motivating factor in her termination, and because a reasonable fact finder could determine that Gorman did not honestly believe that it terminated Culver for insubordination, we REVERSE summary judgment as to Culver's Title VII claim. However, we AFFIRM the dismissal of Culver's Equal Pay Act claim since it has been waived.

## I.

Melody Culver was employed by Gorman as an assistant property manager from May 22, 2000 through January 10, 2002, and was responsible for leasing apartments, responding to resident concerns, completing accounts payable and receivable, processing rent applications and other administrative tasks. In July of 2001, Ron Schroeder became her supervisor. Schroeder increased Culver's work responsibilities, asking her to handle accounts payable and bank deposits for two commercial properties and to help him to learn federal regulations applying to a low-income housing unit they managed. In the fall of 2001, Culver asked Schroeder for a raise because of her increased responsibilities; Schroeder said he would talk to the company controller, but the request was denied. Culver later spoke to Schroeder's supervisor, Peter Jorde, about this issue; Jorde stated that he would talk to Schroeder and get back to her, but she never received a further response. About that time, Schroeder discovered that Culver had saved her resume on her computer at work. When he confronted her about this, Culver explained that she was considering relocating to Pennsylvania to care for her ailing father and

was investigating job possibilities there. Culver also stated, however, that she was uncertain whether her child custody arrangements with her ex-husband would permit such a move. She also assured Schroeder that she liked working for Gorman. Schroeder told Culver to remove the resume from the company computer but did not take any other disciplinary action against her. Schroeder states that he learned in December of 2001, after his budget was complete, that Culver was not leaving. This prevented him from allocating to her a raise comparable to one granted certain other employees.

On January 7, 2002, Schroeder gave Culver her annual performance review, rating her performance as meeting or exceeding expectations in all areas of her job. He told her that she was good with residents and customer service and that he was pleased she had improved relations with another employee, Brad Harrison, with whom she had had a tense relationship in the past. However, Schroeder stated that he was unhappy that Culver had kept her resume on her work computer and had looked for other jobs and further noted that she needed to take credit for both team accomplishments and mistakes, not treat other staff in a degrading manner and stop blaming and complaining about others (although she was improving in this area). Schroeder then gave Culver a 50-cent per hour raise. When Culver asked why it was so small, Schroeder replied that she might be leaving the company. Culver allegedly reiterated that she was not leaving and that it was not fair to give her such a small raise, but Schroeder replied that it was too late to make adjustments since the following year's budget was set.

Upset about her raise, Culver spoke to two male maintenance workers, Brad Harrison and James Crim, and found that Harrison had received a 75-cent raise in addition to a raise he had received in the fall, and that Crim had received a dollar an hour raise. Culver told her coworkers that she was happy for them, but that she thought she was being

treated unfairly. She also mentioned that she was thinking about getting an attorney or filing a complaint with the EEOC. Shortly after she had spoken to the maintenance workers, Culver returned to speak with Schroeder, and inquired whether she would still get her annual bonus if she were to leave the company. Schroeder confirmed that she would indeed receive her bonus, and at Culver's request typed a note confirming this. Culver told Schroeder that she was going to speak to Jorde about her raise, and set up a meeting with Jorde for January 10. Culver alleges that, after he learned of the meeting, Schroeder warned that his budget was set, that speaking with Jorde would not change anything and in fact stated that she "was making a mistake talking with Peter."

Meanwhile, at some point between January 7 and 10, Harrison informed Schroeder that Culver had discussed hiring a lawyer or contacting the EEOC, and Schroeder passed this information along to Jorde. Schroeder also informed Jorde at this time that Culver was unhappy about her raise, and that Harrison had told him that Culver was going to file a discrimination claim with the EEOC. Schroeder states that, from January 7 to 10, Culver's attitude became "totally unacceptable" and that she was "very short" with coworkers and would refuse to perform work tasks at Schroeder's request. Schroeder details one incident in which he asked Culver questions on work issues, and she handed him a manual and told him to look up the answers himself since she was no longer there to train him if he was going to continue treating her in the same manner. Schroeder also asserts that Culver on another occasion stated sarcastically that she wished Gorman would fire her. Because of this purported attitude change, Schroeder allegedly told Jorde at some point before the January 10 meeting that he was ready to fire Culver because of her behavior. Gorman thus contends that the purpose of the January 10 meeting was to work out the difficulties between Culver and Schroeder.

At the January 10 meeting, Culver voiced a number of complaints to Jorde, stating that Schroeder treated male coworkers better, gave her too small a raise either because she was a woman or was a single mother, and increased her job responsibilities without fair compensation. Schroeder assertedly failed to include her in decision making, treating her as a stupid female who just answered phones, barred her from speaking with Harrison about maintenance issues to resolve them and failed to resolve them himself. He also allegedly did not put in enough time at the office and failed to address problems at two company properties, including a leaky roof severe enough to merit a call from the city health department. Jorde then asked Schroeder to join the meeting, and directed her to repeat her complaints. Culver then addressed Schroeder, stating that it wasn't fair that her male coworkers received higher raises, that she should be able to speak with Harrison, that Schroeder had handled some situations such as the leaky roof incorrectly and that he did not listen to resident concerns. At this point, Schroeder said he had heard enough and fired Culver, stating, "That's enough. We have tried this for six months, and it hasn't worked out." When Culver asked why she had been terminated, Schroeder said, "There are issues," that he would cite in an exit interview. But no interview was ever held. Schroeder now claims that he concluded Culver was not willing to improve her conduct and fired her because she had repeatedly criticized his performance and work ethic and he therefore concluded that she could no longer be a team player.

Culver then brought suit seeking monetary and injunctive relief under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e to 2000e-17, and the Equal Pay Act, 29 U.S.C. § 206(d), stating that Gorman had violated both when it terminated her for threatening to bring a sex discrimination complaint. Thereafter, Gorman sought summary judgment on both claims.

The district court first stated that Culver had to rely on the circumstantial evidence of suspicious timing since Gorman had not admitted that it fired her in retaliation for having complained about perceived sex discrimination. While it agreed that the timing was "suspicious," the district court stated that suspicious timing alone was rarely sufficient to create a triable issue, and that the timing was not probative since Gorman "honestly believed" that it was terminating Culver for her insubordinate attitude and refusal to perform work tasks since January 7 and her behavior during the January 10 meeting. The district court then determined that Schroeder reasonably concluded that Culver would no longer respect his authority since, as she conceded, she had refused to answer work-related questions for Schroeder, and because she had criticized his professional competency in the January 10 meeting. The district court further found that Schroeder's comment that Culver had been fired for the vague reason of "issues" did not support a finding of pretext since he gave no specific reason which conflicted with other proffered reasons for his termination decision. Finally, the district court granted Gorman summary judgment on Culver's Equal Pay Act claims, concluding that she could not prove causation.

## II.

We have jurisdiction over this appeal under 28 U.S.C. § 1291. We review the district court's grant of summary judgment *de novo. Mannie v. Potter*, 394 F.3d 977, 982 (7th Cir. 2005). Summary judgment is only appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 312, 322 (1986). The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in her favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).

## A.  *Culver's Ability to Establish Causation*

Culver contends that the district court improperly granted summary judgment on her Title VII and Equal Pay Act retaliation claims. To establish a *prima facie* case for unlawful retaliation, a plaintiff must prove three elements: (1) she engaged in statutorily-protected expression; (2) she suffered an adverse employment action; and (3) there was a causal link between the protected expression and the adverse action. *Krause v. City of La Crosse*, 246 F.3d 995, 1000 (7th Cir. 2001). For purposes of summary judgment only, Gorman concedes that Culver engaged in protected activity and that she suffered an adverse employment action. A causal link between the protected expression and an adverse employment action may be established by showing that the protected conduct was a substantial or motivating factor in the employer's decision. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). "A motivating factor does not amount to a but-for factor or to the only factor, but is rather a factor that motivated the defendant's actions." *Spiegla v. Hull*, 371 F.3d 928, 942 (7th Cir. 2004).[2]

In her appellate brief, Culver relies on the direct method to establish a causal link between her allegations of sex discrimination and her termination. The direct method can be supported either with direct or with circumstantial evidence; direct evidence "essentially requires an admission by the decision maker that his actions were based on the prohibited animus" and so is rarely present. *Rogers v. City*

---

[2]  Both *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 287 (1977), and *Spiegla v. Hull*, 371 F.3d 928, 942 (7th Cir. 2004), address retaliation in the context of the First Amendment, but the causation analysis for retaliation cases is the same under the First Amendment and Title VII. *Spiegla*, 371 F.3d at 943 n. 10.

*of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003) (internal quotation omitted). Culver presents no evidence that Gorman admitted a retaliatory termination. But circumstantial evidence can establish a causal link if the trier of fact can *infer* intentional discrimination. *Id.*

Once the plaintiff has succeeded in making a *prima facie* case, the burden of production shifts to the defendant to prove by a preponderance of the evidence that the same action would have occurred in the absence of the protected conduct. *Spiegla*, 371 F.3d at 943. The persuasiveness of the defendant's explanation is normally "for the finder of fact to assess, unless the court can say without reservation that a reasonable finder of fact would be compelled to credit the employer's case on this point." *Venters v. City of Delphi*, 123 F.3d 956, 973 (7th Cir. 1997). Summary judgment should be granted only if the defendant "presents unrebutted evidence that he would have taken the adverse employment action against the plaintiff even if he had no retaliatory motive." *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002).

Viewing Culver's evidence in the light most favorable to her, as the summary judgment standard requires, Culver has satisfactorily demonstrated a causal link between her protected expression—complaints concerning gender discrimination—and an adverse employment action—her termination. Of major significance is the fact that only three days had elapsed between Culver's initial complaint of discrimination and her termination. This short 72-hour period clearly gives rise to an inference of suspicious timing. But this is not the only evidence of retaliation. "We have never said that [temporal proximity] is dispositive in providing or disproving a causal link." *Sitar v. Ind. Dep't of Transp.*, 344 F.3d 720, 728 (7th Cir. 2003). We have, however, noted that it will "rarely be sufficient in and of itself to create a triable issue." *Stone*, 281 F.3d at 644.

This case is not one of the rare occasions envisioned by *Stone* where suspicious timing alone is enough to establish causation. For suspicious timing may permit a plaintiff to survive summary judgment if there is other evidence that supports the inference of a causal link. *Lang v. Ill. Dep't of Children and Family Servs.*, 361 F.3d 416, 419 (7th Cir. 2004). Suspicious timing is thus "often an important evidentiary ally of the plaintiff." *Lalvani v. Cook Country, Ill.*, 269 F.3d 785, 790 (7th Cir. 2001). "When an adverse employment action follows on the close heels of protected expression and the plaintiff can show the person who de-cided to impose the adverse action knew of the protected conduct, the causation element of the *prima facie* case is typically satisfied." *Id.* Here, there is no question that Schroeder knew of Culver's complaints, and a mere 72 hours elapsed between the time Culver first complained to him of discrimination and his abrupt decision to terminate her, rendering close temporal proximity utterly transparent.

But the evidence also suggests more than closeness in time between Culver's allegations of discrimination and her termination. Culver's termination followed closely on the heels of her annual performance evaluation completed by Schroeder, in which he stated that she had met or exceeded all expectations. Contrary to Gorman's argument to the contrary, an employer's sudden dissatisfaction with an employee's performance after that employee engaged in a protected activity may constitute circumstantial evidence of causation. *Lang*, 361 F.3d at 419-21 (considering plaintiff's previous five-year flawless employment record as circum-stantial evidence giving rise to an inference of causation when combined with other circumstantial evidence). Culver's satisfactory performance review, together with Schroeder's insistence that he harbored no desire to fire her at the time of her annual review, establish that she was in no danger of losing her job until after she made her allega-tions of gender discrimination. Viewing this evidence in the

light most favorable to Culver, a reasonable fact finder
could conclude that the radical reversal of Gorman's
perception of Culver's fitness as an employee was closely
associated with her protected activity, and thus contributes
to an inference of causation.

The final piece of circumstantial evidence that supports
an inference of causation is Schroeder's alleged warning to
Culver that her meeting with Jorde was ill-advised.
Schroeder ostensibly advised Culver several times that her
meeting with Jorde would not alter anything since
Gorman's budget was already set, and apparently also
warned her that she "was making a mistake talking with
Peter." Schroeder ultimately fulfilled his own prophecy by
firing Culver immediately after she repeated, at Jorde's
direction, the very same allegations of discrimination that
she had previously made to Jorde. When viewed in the light
most favorable to Culver, Schroeder's warning, together
with the highly probative timing and the rapid reversal of
Gorman's evaluation of her work performance, creates a
triable inference that her complaints of discrimination were
a substantial and motivating factor in her termination.

B.  *Whether Gorman Honestly Believed that It Fired
    Culver For Insubordination*

Having found that Culver has established a *prima facie*
case of retaliation, the ball is now in Gorman's court to
show by a preponderance of the evidence that Culver would
have been fired even absent her allegations of discrimina-
tion. Gorman asserts in effect that Culver would have been
fired irrespective of her allegations of discrimination since
she developed an insubordinate attitude in the three days
following her annual review. Gorman refers to two incidents
of insubordination: (1) Culver's refusal to answer a work-
related question asked by Schroeder (when she handed him
a manual and told him to look up the answer himself); and

(2) Culver's "insubordinate" attitude during the January 10 meeting before Jorde and Schroeder. Gorman contends that each incident of alleged insubordination is uncontested by other evidence in the record, and that each was sufficient to support Culver's termination. For her part, Culver concedes that she did tell Schroeder to look up the answer to his own question, but denies that she was insubordinate to Schroeder in the presence of Jorde.

As has been regurgitated *ad nauseum*, this Court is not a "super personnel review board" that second-guesses an employer's facially legitimate business decisions. *Ajayi v. Aramark Bus. Servs.*, 336 F.3d 520, 532 (7th Cir. 2003). We would hardly be so foolish as to suggest that insubordination is not a legitimate reason for an employer to fire an employee. *Hottenroth v. Village of Slinger*, 388 F.3d 1015, 1031-32 (7th Cir. 2004). But the issue before us is not whether an employer's evaluation of the employee was correct but whether it was honestly believed. *Olsen v. Marshall & Ilsley Corp.*, 267 F.3d 597, 602 (7th Cir. 1994). An employer's explanation can be "foolish or trivial or even baseless" so long as it "honestly believed" the proffered reasons for the adverse employment action. *Hartley v. Wisc. Bell, Inc.*, 124 F.3d 887, 890 (7th Cir. 1997). Summary judgment is appropriate only if a reasonable fact finder would be compelled to believe Gorman's explanation, *Venters*, 123 F.3d at 973, and Culver can avoid summary judgment by pointing to specific facts that place the employer's explanation in doubt. *Zaccagnini v. Chas. Levy Circulating Co.*, 338 F.3d 672, 676 (7th Cir. 2003). We conclude here that the evidence, taken in the light most favorable to Culver, creates a triable issue of pretext. We will consider each alleged incident of insubordination in turn.

### 1. *Culver's Refusal to Answer Schroeder's Question*

Insubordination is defined as "willful disregard of an employer's instructions" or "an act of disobedience to proper authority." BLACK'S LAW DICTIONARY 814 (8th ed. 2004). Culver's undisputed refusal to answer Schroeder's request for information appears to qualify as disobedience or defiance even if about a relatively trivial matter.

Gorman, however, did not refer to this incident as an example of insubordination until filing its summary judgment motion. This was only after Culver mentioned the matter in her deposition. Schroeder failed to mention any specific instances of insubordination at the time of the firing; he later at his deposition, when asked to identify all incidents of Culver's insubordination, failed to mention this matter. This failure to earlier mention the incident as a reason for termination is evidence of pretext. *See Emmel v. Coca-Cola Bottling Co. of Chi.*, 95 F.3d 627, 634 (7th Cir. 1996) (affirming a jury's factual determination that defendant's nondiscriminatory reason for its hiring decision was pretextual in part because it was not put forth upon the plaintiff's initial inquiry). When he terminated Culver, Schroeder referred only to "issues" which would be discussed at an exit interview (which never took place). Gorman's response to Culver's application for unemployment benefits was similarly vague—referring only to "performance issues".

### 2. *Culver's Alleged Insubordination During the January 10 meeting*

Gorman further contends that Culver was insubordinate to Schroeder during the January 10 meeting with Jorde by telling Jorde that Schroeder pushed his job off on her, did not perform all required property management tasks, prevented her from speaking with the maintenance staff to resolve maintenance issues and had failed to attend to a leak at one property until the city health department had

issued a citation. Of course "[w]e have consistently held that an employee's insubordination toward supervisors and coworkers, even when engaged in protected activity is justification for [adverse employment action]." *Love v. City of Chi. Bd. of Educ.*, 241 F.3d 564, 570 (7th Cir. 2001) (quoting *Kahn v. United States Sec'y of Labor*, 64 F.3d 271, 279 (7th Cir. 1995)). Culver, however, vigorously protests Gorman's characterization of her conduct, stating that she did not raise her voice throughout the January 10 meeting, and, of course, the stated purpose of the meeting was to air her discontents. Whether her non-confrontational comments in the course of such a meeting amounted to "insubordination" is a jury question bearing on the issue of pretext.

Culver's criticisms of Schroeder's ability as a manager do not appear to have been personal attacks by an irate employee but objectively supportable concerns voiced at the invitation of a superior manager. Jorde's instructions to Culver to repeat her criticisms of Schroeder to his face resulted in just that. If anything, Culver was following her superior's directive, and so was being subordinate, not *in*subordinate. The citing of this encounter as grounds for termination seems a stretch.

### 3. *Whether Schroeder Honestly Believed that Culver was Terminated for Insubordination*

Of course, the basic question is whether Schroeder *honestly believed* that Culver's refusal to answer his question, her allegedly sudden change in attitude or her insubordinate criticisms of his professional competency justified her termination. In that respect, his failure to discuss these incidents when provided with opportunities to do so is troubling. Various incidents occurring immediately before she was fired are cited as grounds for termination, but Schroeder identified none of these incidents either when he fired Culver or during his deposition. Thus, viewing this

evidence in the light most favorable to Culver, a reasonable jury could determine that Schroeder's silence indicated that this explanation was pretextual.

Gorman contends that an explanation is not pretextual merely because an employer provides a reason for an adverse employment action only after litigation has commenced. *See Pugh v. City of Attica, Ind.*, 259 F.3d 619, 629 (7th Cir. 2001). However, in *Pugh* the employer had not provided an explanation at the time of the firing, but offered evidence—board meeting minutes and an investigation report discussing the reasons for the adverse action—suggesting that the reason for the termination arose contemporaneously with it and, in any event, predated the advent of litigation. *Id.* Here, Gorman relies only on Schroeder's assertion in his affidavit that he conferred with Jorde prior to the January 10 meeting and told him that he was ready to fire Culver if her negative attitude persisted. But this claim comes so late in the day as to permit an inference of pretext. Further, although the district court correctly noted that employers may elaborate on the reasons for an adverse employment action once litigation has commenced, *Perfetti v. First National Bank of Chicago*, 950 F.2d 449, 457 (7th Cir. 1991), here, Gorman had only a vague reference to "issues" on which to elaborate.

Gorman's inconsistency in describing the timing of Culver's work problems heightens our uncertainty over whether Gorman honestly believed that Culver was fired for insubordination. When Schroeder fired Culver, he stated, "We have tried this for six months and it hasn't worked out." Yet, in its motion for summary judgment, Gorman confined Culver's employment "issues" to the three days from her annual evaluation on January 7 to her termination on January 10. An inconsistent employer explanation may help to support a finding of pretext. *Zaccagnini*, 338 F.3d at 678. If Culver's attitude did indeed fall off the cliff of acceptable workplace behavior in the three days prior to her

termination, we find it surprising that Schroeder did not specifically refer contemporaneously to this recent period of substandard behavior. On summary judgment, in the context of a firing almost immediately following a protected complaint, we must question as pretextual assertions of problematic conduct tardily distilled into specific claims.

Finally, Schroeder's sudden dissatisfaction with Culver's performance casts further doubt over whether Schroeder honestly believed he fired Culver due to her insubordination. While the relevant time for determining the effectiveness of an employee is the time of discharge, "previous employment history may be relevant and probative in assessing performance at the time of termination." *Fortier v. Ameritech Mobile Communications*, 161 F.3d 1106, 1113 (7th Cir. 1998). *Cf. Giacoletto v. Amax Zinc Co.*, 954 F.2d 424, 426-27 (7th Cir. 1992) (holding that jury could consider earlier evaluations in determining whether the reasons given for discharge were pretextual when a plaintiff asserting age discrimination received a suspiciously negative annual review just six days before he was fired). Since it preceded her termination by only three days, Culver's annual performance evaluation is especially relevant in assessing performance at the time of termination. Viewing all the evidence in the light most favorable to Culver, a reasonable jury could determine that Gorman's reasons for Culver's termination are pretextual.

### 4. *Culver's Termination as a Preemptive Measure*

As a secondary explanation for Culver's termination, Gorman suggests that this action was a preemptive measure driven by its honest belief that she was imminently planning to quit. Gorman states that Culver was likely to leave her job because she had previously discussed moving to Pennsylvania to care for her ailing father, had repeatedly expressed displeasure with her raise and with Schroeder's

continued supervision, and because she had sought written confirmation that she would receive her annual bonus if she left the company. We have previously held that "it is not discriminatory for an employer to take a preemptive action against an employee who has announced her intention to leave at the first opportunity." *Miller v. Am. Family Mut. Ins. Co.*, 203 F.3d 997, 1009 (7th Cir. 2000). In *Miller*, the plaintiff-employee (who had threatened to quit on three prior occasions) delivered an ultimatum that she would quit if she did not receive the raise that she had requested. *Id.*

However, viewing the evidence in the light most favorable to Culver, the record does not compel Gorman's conclusions. Culver did not announce her intention to leave Gorman at the first available opportunity, and in fact asserts that she never threatened to quit her job. (Culver Aff. ¶ 33).[3] With respect to Culver's possible move to Pennsylvania, Gorman acknowledges that Culver informed Schroeder in December of 2002 that she was not moving to Pennsylvania. (Gorman Br. at 2). While some of Culver's actions, such as her request for a written confirmation that she would receive her bonus, suggest an intention to leave her job, others such as her willingness to schedule a meeting with Jorde to attempt to resolve certain issues suggest the opposite. And she did state to Schroeder that she could not afford to quit her job. We are extremely reluctant to extend the holding of *Miller* to include situations where an employee does not explicitly

---

[3] Ironically, Culver's intention to keep her job is shown by a statement that Gorman repeatedly and erroneously quoted throughout its brief and during oral argument, to the effect that Culver had told Schroeder at the January 10 meeting to "take this job and shove it." Culver in fact never made such a bald declaration; instead, she told Schroeder, "I don't know why you feel you can do this to me and I don't know if you think it's because I'm a woman or because I'm a single mom and I can't tell you to stick this job." (R. 19; Culver Dep. p. 52).

indicate her intention to leave at the first available opportunity. There is thus a genuine issue of material fact as to whether Schroeder honestly believed Culver was about to leave Gorman. And, in any event, we need not find an issue that retaliation was the sole or but-for cause of the firing, only that it was a motivating factor.

### 5. *Culver's Equal Pay Act Claims*

On appeal, Culver has merely asserted that the district court incorrectly granted summary judgment to Gorman on her claims under Title VII and the Equal Pay Act, but she has adequately discussed only her Title VII claims. We therefore find that Culver has waived her Equal Pay Act claim, since it is unsupported and undeveloped. *See United States v. Turcotte*, 405 F.3d 515, 536 (7th Cir. 2005) ("In this circuit, unsupported and undeveloped arguments are waived.") (citations omitted).

### III.

For the foregoing reasons, we REVERSE the district court's grant of Gorman's motion for summary judgment on her Title VII claim, and REMAND for proceedings consistent with this opinion. We AFFIRM summary judgment on the Equal Pay Act claim.

A true Copy:

　　　　Teste:

　　　　　　　　　　_____
　　　　　　　　　　*Clerk of the United States Court of*
　　　　　　　　　　*Appeals for the Seventh Circuit*