In the

# United States Court of Appeals
## For the Seventh Circuit

No. 17-2687

SCOTT A. MILLIMAN, SR.,

*Plaintiff-Appellant,*

*v.*

COUNTY OF MCHENRY, *et al.,*

*Defendants-Appellees.*

Appeal from the United States District Court for the
Northern District of Illinois, Western Division.
No. 3:11-cv-50361 — **Frederick J. Kapala**, *Judge.*

ARGUED MAY 31, 2018 — DECIDED JUNE 19, 2018

Before FLAUM, MANION, and HAMILTON, *Circuit Judges.*

FLAUM, *Circuit Judge.* Plaintiff Scott A. Milliman, Sr. is a former McHenry County Sheriff's Deputy. While working for the McHenry County Sheriff's Department ("MCSD"), Milliman gave a deposition in which he accused Sheriff Keith Nygren of corruption, bribery, securing fraudulent loans, trafficking illegal aliens, and soliciting the murder of two individuals. Based upon these allegations, Nygren and his subordinates referred Milliman to a psychologist to evaluate

whether he was fit for duty. The psychologist determined that Milliman suffered from cognitive and psychological problems from a previous brain tumor in his right frontal lobe that rendered him unfit to perform his duties. MCSD terminated Milliman based upon the results of the fitness examination, the false allegations against Nygren, and violations of multiple MCSD General Orders. In response, Milliman sued Nygren, Nygren's subordinates, and the county in federal district court under 42 U.S.C. § 1983. Milliman claimed that defendants violated his First Amendment rights by retaliating against him for making protected speech. The district court granted summary judgment to defendants on the ground that the fitness-for-duty examination provided an independent, non-retaliatory, non-pretextual basis for Milliman's termination. For the reasons below, we affirm.

## I. Background

Milliman became a McHenry County Sheriff's Deputy on March 2, 1998. In December 2001, Milliman was diagnosed with brain cancer. On July 21, 2002, Milliman underwent brain surgery and went on extended medical leave to recover. Before returning to work, Dr. Christopher Grote evaluated Milliman and determined that he was fit for duty. Milliman returned to MCSD on November 17, 2003.

### A. Milliman's 2010 Deposition

In November 2010, former MCSD Sheriff's Deputy Zane Seipler brought a case against MCSD. The details of Seipler's suit are not relevant here, other than the fact that Milliman gave a deposition in the course of the litigation, during which

he testified that Nygren and a local businessman, Jose Rivera, engaged in numerous criminal activities.

First, Milliman maintained that Nygren participated in bribery schemes. For example, he testified that Rivera told him about a scheme in which Nygren and Rivera fixed non-valid-driver's-license tickets for a $1,000 fee. Additionally, Milliman claimed Rivera told him that Nygren received a $10,000 bribe to help an individual reinstate a liquor license, and that same individual later contributed more than $5,000 cash to Nygren's sheriff campaign.

Next, Milliman testified that Rivera and Nygren tried to recruit him into a Small Business Administration ("SBA") loan fraud scheme in 2001 or 2002. According to Milliman, Rivera told him they sent undocumented individuals to a woman named "Maria" at Elgin State Bank to fill out an application for an SBA loan. Nygren and Rivera would give $10,000 of the proceeds to the undocumented individual and split the remaining proceeds between them. The borrower would then default on the loan and return to Mexico. Milliman testified that Nygren and Rivera later moved the scheme to Home State Bank.

Third, Milliman testified that Rivera and Nygren tried to recruit him to participate in a scheme to traffic undocumented immigrants into McHenry County. According to Milliman, Rivera and Nygren charged $1,100 per person to bring individuals from Zacatecas, Mexico to an apartment complex in Woodstock, Illinois.

Finally, Milliman testified that Nygren solicited him to kill two individuals. Milliman claimed that, in 1999, Nygren asked him to push retired McHenry County Circuit Judge

Conrad Floeter—who at the time was the campaign manager for Nygren's opponent for sheriff—in front of a train. Additionally, Milliman said that in 2009, Nygren asked him to "hang" David Bachmann, a local internet blogger who made comments about Nygren, and make sure "that it looks like a suicide."

Milliman testified that in 2007, he called Patrick Fitzgerald, the United States Attorney for the Northern District of Illinois, and reported Nygren's criminal conduct. According to Milliman, he then met with several FBI agents.

### B. MCSD's Investigation

Nygren and several of his subordinates received copies of Milliman's deposition transcript from the *Seipler* case. Undersheriff Andrew Zinke and Commander John Miller investigated the matter. After reading Milliman's deposition, Miller determined that, due to the bizarre nature of the allegations, Milliman might have been suffering from "psychological difficulties." Miller drafted a memorandum recommending that Milliman be placed on administrative leave and sent for a fitness-for-duty examination and that an independent agency look into Milliman's allegations. Miller also noted that he would look into the FBI's response to Milliman's allegations. Although Miller recommended handling the matter as a medical issue instead of a disciplinary one, the investigation file was titled "Termination Review."

On December 23, 2010, Milliman was placed on administrative leave and ordered to attend a fitness-for-duty psychological examination with Dr. Robert Meyers. Milliman objected to Dr. Meyers on the ground that he had a personal re-

lationship with Nygren and had contributed to Nygren's campaign. Instead, Milliman's counsel requested a neutral examiner. Defendants chose Dr. Grote, who performed Milliman's fitness-for-duty examination in 2003.[1]

Meanwhile, Zinke sent a letter to the FBI requesting information about its investigation into Milliman's allegations. In response, the FBI stated that it could "confirm that Deputy Milliman has approached our office in the past and provided information in confidence that he felt may be of interest to the FBI." It further stated that "[w]here appropriate, investigation was conducted to determine the validity of the allegations," but that "none of the information provided by Deputy Milliman was determined to have prosecutive merit."

## C. Dr. Grote's Fitness-for-Duty Examination

On February 12, 2011, Dr. Grote conducted Milliman's fitness-for-duty examination. In the narrative portion of his report, Dr. Grote wrote that Milliman was:

> Extremely disorganized and "derailed" in interview. He was over-inclusive, tangential and very difficult to follow at certain points in the interview, particularly when he was describing his allegations about corruption in McHenry County. It typically would take over 5 minutes for him to describe a specific allegation,

---

[1] There is some dispute about who suggested Dr. Grote as the neutral examiner. At his deposition, Milliman testified that *he* provided Dr. Grote's name, but Milliman's counsel wrote a letter to MCSD in which he just requested "any neutrally chosen psychologist." Because we must resolve this conflict in plaintiff's favor at summary judgment, we assume that defendants selected Dr. Grote.

which I would later summarize for him in 30 seconds
or less to see if this is what he was alleging.

Dr. Grote's report further stated that Milliman "would typically veer from one story to another, or make an unclear allegation about one thing before going on to another unclear allegation." Accordingly, Dr. Grote had to provide "structure," rephrasing and summarizing Milliman's statements, "to understand what [Milliman] was alleging." Dr. Grote wrote that, "[a]t other times, there seemed to be a lack of logic, or even possibly a hypomanic element to some of [Milliman's] claims."

For example, Milliman told Dr. Grote that the FBI agents got angry with him because he followed them while they followed another subject. According to Dr. Grote, Milliman's explanation of that incident was "incomprehensible." Milliman also told Dr. Grote that the purpose of MCSD's officer exchange program was to "take over" the town of Zacatecas, Mexico. Moreover, Milliman claimed that Chipotle took his idea in creating its restaurant chain. In addition to being difficult to understand, Dr. Grote found some of Milliman's stories "hard to believe." Nevertheless, it appeared to Dr. Grote that "[Milliman] believed what he said."

According to Dr. Grote's report, Milliman also shared several personal facts about himself. During the interview, Milliman told Dr. Grote that following his brain surgery in 2002, he was no longer able to remember anything from his birth in 1961 until 1996, including his schooling, marriage, or children. The only thing he could remember was the 1985 Super Bowl Champion Chicago Bears. Milliman had not mentioned this memory loss during his 2003 examination. A week after the interview, Milliman called Dr. Grote and contradicted his

prior statement, claiming his memory loss was only between 1980 and 1990. Dr. Grote asked Milliman why he had not mentioned the memory loss in 2003 and why his account of his memory loss had changed. Milliman responded that he "wasn't aware of these discrepancies in self-report and didn't know what to make of them."

Milliman also completed several psychological tests and scored mostly in normal ranges, performing about the same or better than he did in 2003, with a few key exceptions. Specifically, Dr. Grote noted that Milliman was "now doing better on nonverbal ability and nonverbal learning and memory," and that "[o]ther cognitive test scores are similar to before." However, Milliman's verbal skills were in the "borderline impaired range" and "[h]is lack of 'general knowledge' … was rather striking." For instance, "he answered that the sun rose in the west, that Brazil was on the continent of Spain, etc." In addition, Milliman scored poorly on the Rey Complex Figure test, which is "consistent" with frontal lobe dysfunction.

Dr. Grote also discussed Milliman's results on the Minnesota Multiphasic Personality Inventory-2 ("MMPI-2"). Milliman's results were consistent with "significant feelings and symptoms of paranoia, feelings of being persecuted, disorganized or dysfunctional cognition and emotions, and difficulty working with figures of authority." Dr. Grote explained that "[i]n 2003, he had shown a significant elevation on only one of the critical scales (scale 4); thus his current MMPI-2 profile shows more evidence of psychiatric problems and symptoms than in 2003." In comparing Milliman's 2003 and 2011 results, Dr. Grote also noted that "the 2003 evaluation did not indicate the disorganization now seen in conversation

and on some testing, nor in 2003 was there any reference to claimed loss of autobiographical memories."

At his deposition in this case, Dr. Grote testified that, due to the prospect of Milliman losing his job, his MMPI-2 score could have reflected his present mental state rather than a longstanding permanent trait. However, Dr. Grote also clarified that Milliman's feelings on the day in question could not completely explain his MMPI-2 results.

Dr. Grote also interviewed several "collaterals" in Milliman's life, including Miller and Nygren. Miller told Dr. Grote that he was unaware of any basis for Milliman's allegations. He also informed Dr. Grote that the retirement age for deputies was fifty (Milliman's age at the time) and that Milliman had disability options. Miller said he sometimes questioned whether Milliman was being honest, citing as an example Milliman's claims in an unrelated class action lawsuit in which Milliman was a plaintiff.

In addition, Miller forwarded Dr. Grote a report from the Algonquin Police Department detailing an incident involving Milliman while he was on administrative leave. According to the report, Milliman and an individual named Mrs. Prate were studying for a real estate exam at Mrs. Prate's house. Mrs. Prate's husband entered the house and "overheard his wife and Mr. Milliman discussing their affair and their plan to have Mr. Prate killed and how this would affect the titling of the Prate home." Miller did not send Dr. Grote the supplemental police report, which explained that, in fact, Milliman was just discussing a hypothetical question in his real estate textbook about ownership of property after sudden death. Miller also sent Dr. Grote a memorandum in which he wrote that, to his knowledge, the FBI might have met with Milliman

in 2007 but did not conduct an investigation into his claims.[2] Miller said in his memorandum that he would look into it further.

Meanwhile, Nygren told Dr. Grote that "Milliman made false claims that had no basis, and as such that his office could initiate termination proceedings if no extenuating circumstances (such as a disabling condition) could explain the making of these claims." Nygren knew that Milliman had previously been treated for a brain tumor and wanted to know if his allegations were the result of a medical or psychological condition.

When Dr. Grote asked Milliman for another deputy who could give Milliman's side of the story, Milliman told him to talk to Deputy Bodden. Bodden told Dr. Grote that he "was not aware of any particular problems with Mr. Milliman's performance as a deputy, but did mention that his memory could be 'goofy' at time[s]." For example, Bodden explained that Milliman could remember the make and model of a car involved in a crime from five years ago, but could not remember if he was supposed to work the next day.

Dr. Grote also spoke to Milliman's wife. She said she did not witness any change in Milliman's behavior after his surgery. She also said that, until the previous year, she had not been aware of Milliman's association with the FBI. When asked about her husband's memory loss, she said that after his brain surgery he lost his memory of the 1980s.

---

[2] Miller denies sending the memorandum to Dr. Grote. However, the first page of the memorandum was found in Dr. Grote's file. We resolve this dispute in plaintiff's favor for purposes of summary judgment.

As a result of his overall examination, Dr. Grote concluded that "Milliman is judged to now have cognitive and psychological problems that seem to significantly interfere with his ability to effectively work as a deputy sheriff … consistent with the effects of his having had a right frontal lobe (insula cortex) brain tumor along with chemotherapy and radiation." In support of his conclusion, Dr. Grote cited Milliman's: (1) disorganized conversation consistent with frontal lobe dysfunction; (2) disorganization and impairment on some tests of cognitive ability, also consistent with frontal lobe dysfunction; (3) autobiographical memory loss and "shifting claims" of memory loss that are "suggestive of psychiatric impairment, possibly secondary to brain dysfunction"; (4) abnormal MMPI-2 profile that is "suggestive of significant psychiatric impairment, particularly of feelings of paranoia and dysfunctional thoughts and emotions, and a lack of insight on his part," which is "likely at least partially secondary to his frontal lobe dysfunction"; and (5) poor judgment, as reflected by his uncorroborated allegations of corruption and conspiracy and the incident at the Prate residence. Dr. Grote further noted that Milliman's "problems with judgment, disorganization and communication all would seem to interfere with his work duties and all are consistent with the effects of his illness and treatment."

Dr. Grote acknowledged that "[t]he final interpretation of Mr. Milliman's behavior and allegations could change somewhat in the future, depending on what, if anything, might later be revealed from the FBI files, other 'undercover' operations alleged to be ongoing, or new/conclusive information about what really happened at the Prate residence." However, Dr. Grote also wrote that "new or different information that

might come out in the future would not 'undo' the problems seen at present."

### D. Milliman's Termination

After receiving Dr. Grote's report, Nygren and the MCSD encouraged Milliman to retire with disability benefits in lieu of termination. However, Milliman did not submit the required disability paperwork. As a result, Milliman was terminated for: (1) making false allegations against Nygren in the *Seipler* deposition; (2) violating multiple MCSD General Orders; and (3) being unfit to perform his duties as a deputy.

### E. The Present Litigation

On December 9, 2011, Milliman filed a § 1983 lawsuit against Nygren, Zinke, Miller, and other officers. He alleged that defendants retaliated against him for his 2010 deposition testimony in violation of the First Amendment; interfered with his freedom of association in violation of the First Amendment; and engaged in a civil conspiracy to do the same under state law. Milliman also brought a *Monell* claim against Nygren in his official capacity as the final policymaker responsible for his termination.

In response to a subpoena, the FBI produced 187 pages of heavily redacted documents. Those documents show that Milliman brought all of the complaints mentioned in his 2010 deposition testimony, and many more, to the FBI's attention. In 2006, Milliman began working as a cooperating witness for the FBI. He wore a recording device and attempted to get Rivera and Nygren to make incriminating statements. However, Milliman was unable to elicit any such statements, and he stopped working with the FBI in 2009. The FBI concluded that all of his claims lacked prosecutive merit.

During his deposition for this case, Milliman testified to the same allegations of criminal conduct that he discussed in the *Seipler* case. For example, to support an inference of an SBA loan fraud scheme involving Nygren and Rivera, he pointed to a 2010 consent order between Elgin State Bank and the Federal Deposit Insurance Corporation. However, he admitted that he could not point to an example of a loan that would support his allegations, and he conceded that he did not fully understand what the consent order was about. In response to a subpoena, Elgin State Bank stated it did not have any relationship with any of the individuals alleged to be involved.

Milliman similarly pointed to a 2010 agreement between Home State Bank and the Comptroller of the Currency to support an inference of fraudulent SBA loan activity at that bank. However, the CEO of Home State Bank, Steve Slack, testified that he had no knowledge of an SBA loan fraud scheme and that the bank did not possess documents that would reflect such a scheme. Rather, Slack testified that the agreement between Home State Bank and the Comptroller was the result of the 2008 financial crisis and addressed all aspects of their banking practices—not SBA loans in particular. Nevertheless, Slack agreed that it would be possible for individuals to defraud the bank by procuring SBA loans.

Rivera testified that he knew an individual named Maria Villareal who had worked at both banks. Rivera further testified that he had personally received loans from Home State Bank in excess of the value of his real estate holdings. Based upon Rivera's personal loan history, Milliman testified that one could infer fraudulent loan activity. However, Milliman

admitted at his deposition that Rivera's loans could have been legitimate.

Next, to support his allegations regarding the ticket-fixing scheme, Milliman produced McHenry County Court records showing forty-four examples of criminal charges being dismissed or significantly reduced for individuals who made campaign contributions to Nygren. However, there are often long time gaps between the campaign contribution and the dropping of charges. Milliman admitted that he did not speak with any individual on the list, nor did he speak with any prosecutor regarding the decisions behind the dismissed tickets. Likewise, with respect to the $10,000 bribe to reinstate a liquor license, Milliman testified that he did not see Rivera give Nygren $10,000, did not speak with Nygren about it, and knew of no witnesses to the scheme. Milliman further admitted that it is possible it never happened.

Next, Milliman retracted his claim that Nygren solicited him to murder Judge Floeter. However, he maintained that Nygren asked him to hang David Bachmann. Milliman testified that he immediately reported this solicitation to the FBI and was given a wired key fob to bring with him the next time he met with Nygren. However, Milliman testified that Nygren did not ask him to murder Bachmann the next time they met because he "was probably tipped off."

As proof of the human trafficking scheme, Milliman testified that in 2007 he met a truck driver from Zacatecas, Mexico who said Jose Rivera brought him into the country. Milliman admitted that the man did not tell him that he gave Rivera any money, and called it a "guess" that this man was part of Rivera's illegal trafficking scheme. Milliman also testified that the manager of Stone Lake Apartment Complex told him that

the complex was heavily populated with individuals from Zacatecas.

### F.  Dr. Dawkins's Expert Report

Milliman retained a clinical psychologist, Marva P. Dawkins, as an expert to review Dr. Grote's report. Dr. Dawkins has conducted or supervised more than 3,000 fitness-for-duty examinations in her career. To prepare her expert report, Dr. Dawkins reviewed Dr. Grote's documents and held a two-hour interview with Milliman.

Dr. Dawkins concluded that Dr. Grote placed too much weight on the corruption allegations and the department's opinions of Milliman. According to Dr. Dawkins, Dr. Grote should have relied more on the objective test results, which she interpreted to be similar to the results from the 2003 test. Although Dr. Dawkins acknowledged that the MMPI-2 results showed abnormalities compared to 2003, she believed that the results were more likely situational than due to psychiatric impairment. With respect to Milliman's disorganized and derailed manner in conversation, Dr. Dawkins opined that this was not corroborated by the test data or collateral sources. Dr. Dawkins further believed that Dr. Grote failed to explain how and to what extent Milliman's amnesia would interfere with his job duties. Nevertheless, Dr. Dawkins did not state that Dr. Grote's ultimate conclusion was incorrect or that Milliman was, in fact, fit for duty.

### G.  The District Court's Summary Judgment Order

On August 7, 2017, the district court granted summary judgment for defendants on all claims, ruling that Dr. Grote's

report provided an independent, non-retaliatory, non-pre-textual reason for Milliman's termination. This appeal followed.

## II. Discussion

We review the district court's grant of summary judgment de novo. *Swetlik v. Crawford*, 738 F.3d 818, 826 (7th Cir. 2013). Summary judgment is appropriate if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "In applying this standard we draw all reasonable inferences and resolve factual disputes in favor of the nonmoving party …." *Malen v. MTD Prods., Inc.*, 628 F.3d 296, 303 (7th Cir. 2010).

### A. First Amendment Retaliation Claim[3]

"The First Amendment, incorporated against the states through the Fourteenth Amendment, shields government employees from retaliation for engaging in protected speech." *Diadenko v. Folino*, 741 F.3d 751, 755 (7th Cir. 2013). To prevail on a First Amendment retaliation claim, "a public employee must show that: (1) she engaged in constitutionally protected speech; (2) she suffered a deprivation because of her employer's action; and (3) her protected speech was a but-for cause of the employer's action." *Id.*

With respect to the third factor, a plaintiff must "show that a violation of his First Amendment rights was a motivating factor of the harm he's complaining of." *Thayer v. Chiczewski*, 705 F.3d 237, 251 (7th Cir. 2012) (internal quotation marks

---

[3] Milliman's freedom of association claim also arises under the First Amendment and is analyzed under the same legal test. Therefore, it rises or falls with his retaliation claim.

omitted) (quoting *Greene v. Doruff*, 660 F.3d 975, 977 (7th Cir. 2011)). After the plaintiff makes that showing, "the burden shifts to the defendant to show that the harm would have occurred anyway." *Id.* at 251–52 (quoting *Greene*, 660 F.3d at 977). "Once a defendant produces evidence that the same decision would have been made in the absence of the protected speech, the burden shifts back to the plaintiff to demonstrate that the proffered reason was pretextual and that the real reason was retaliatory animus." *Id.* at 252. "At the summary judgment stage, this means a plaintiff must produce evidence upon which a rational finder of fact could infer that the defendant's proffered reason is a lie." *Id.* (quoting *Zellner v. Herrick*, 639 F.3d 371, 379 (7th Cir. 2011)).

Ordinarily, "the persuasiveness of an employer's non-retaliatory explanation … is 'for the finder of fact to assess.'" *Massey v. Johnson*, 457 F.3d 711, 719 (7th Cir. 2006) (quoting *Venters v. City of Delphi,* 123 F.3d 956, 973 (7th Cir. 1997)). However, "summary judgment should be granted when, in light of the defendant's unrebutted evidence, 'the court can say without reservation that a reasonable finder of fact would be compelled to credit the employer's case on this point.'" *Id.* (quoting *Venters*, 123 F.3d at 973). "We have repeatedly emphasized that when 'assessing a plaintiff's claim that an employer's explanation is pretextual, we do not … second-guess[] an employer's facially legitimate business decisions.'" *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 564 (7th Cir. 2016) (alterations in original) (quoting *Argyropoulos v. City of Alton*, 539 F.3d 724, 736 (7th Cir. 2008)). "An employer's reasons for firing an employee can be 'foolish or trivial or even baseless,' as long as they are 'honestly believed.'" *Id.* (quoting *Culver v. Gorman & Co.*, 416 F.3d 540, 547 (7th Cir. 2005)).

Here, Milliman's speech was clearly a motivating factor in defendants' decision to terminate his employment. Indeed, the termination letter identifies Milliman's false accusations as one of the reasons for his termination. However, defendants argue that Milliman would have been fired anyway because they honestly believed, based upon Dr. Grote's psychological report, that Milliman was unfit to perform his duties. Plaintiff does not dispute that defendants have met their burden at the second step. Therefore, the question is whether Milliman has produced sufficient evidence from which a jury could reasonably infer that defendants' proffered reason is pretextual.

To meet this burden, Milliman claims that a jury could reasonably find that Dr. Grote's conclusions were not independent. This is so, Milliman argues, because defendants deliberately gave Dr. Grote false, misleading, and irrelevant information in an attempt to influence his decision in various ways. Specifically, Milliman points to the following statements and communications:

1.  Miller told Dr. Grote he had concerns about Milliman's honesty arising out of an unrelated class action lawsuit in which Milliman was a plaintiff;

2.  Miller sent Dr. Grote a memorandum in which he wrote that, to his knowledge, the FBI had not conducted an investigation into Milliman's claims;

3.  Miller told Dr. Grote that Milliman was eligible for retirement and could go on disability;

4.  Miller forwarded Dr. Grote an incomplete set of police reports indicating that Milliman was overheard planning to kill Mr. Prate, but did not forward a

supplemental report which showed that, in fact, Milliman was just discussing a hypothetical question in his real estate textbook; and

5. Nygren told Dr. Grote that Milliman's claims were false, and that he could therefore be terminated unless extenuating circumstances, such as a disabling condition, could explain his allegations.

Milliman argues that these communications were intended to attack Milliman's credibility and persuade Dr. Grote that Milliman would be better off if he was found unfit.[4]

Contrary to plaintiff's assertion, these statements do not undermine the independence of Dr. Grote's conclusion that Milliman was unfit for duty. True, Dr. Grote cited Milliman's "bad judgment" with respect to the uncorroborated conspiracy allegations and the Prate incident as one of the reasons for his fitness determination. Dr. Grote also acknowledged that "[t]he final interpretation of Mr. Milliman's behavior and allegations could change somewhat in the future, depending on what, if anything, might later be revealed from the FBI files, other 'undercover' operations alleged to be ongoing, or new/conclusive information about what really happened at the Prate residence." Critically, however, Dr. Grote stated in his report that "new or different information that might come

---

[4] Milliman does not claim that it was improper for Dr. Grote to speak to Miller and Nygren as part of his examination. Indeed, even Dr. Dawkins testified that it was appropriate for Dr. Grote to get "collateral information" because "[h]e needed to have some corroboration from people who knew the deputy." Dr. Grote also spoke to individuals who would give Milliman's side of the story, including Milliman's wife, Deputy Bodden, and Milliman's attorney.

out in the future would not 'undo' the problems seen at present." Moreover, Dr. Grote cited several additional reasons to support his conclusion that Milliman was unfit. Those reasons include: Milliman's disorganized and derailed conversation during the interview; his impairment on some of the cognitive tests; his conflicting self-reports of memory loss; and his abnormal test results on the MMPI-2. All of these factors are consistent with frontal lobe dysfunction resulting from Milliman's brain tumor, chemotherapy, and radiation. Thus, Dr. Grote's conclusion did not depend upon Milliman's credibility,[5] the truth of Milliman's accusations against Nygren, the FBI's investigation into those allegations, or what actually happened at the Prate residence.

Nor did Miller and Nygren's statements about Milliman's potential termination, retirement eligibility, and disability benefits influence Dr. Grote's fitness finding. If anything, these statements indicate that defendants believed they could terminate plaintiff's employment *regardless* of Dr. Grote's conclusion. If so, defendants would not need to pressure Dr. Grote to manufacture a pretextual reason to fire Milliman. Furthermore, although Dr. Grote referenced these statements when summarizing his interviews with Nygren and Miller, he never relied on them as a reason for finding Milliman unfit. Given the numerous other reasons cited by Dr. Grote, a jury

---

[5] Although both Miller and Nygren expressed concerns about Milliman's honesty, it seems Dr. Grote found Milliman credible. In his report, Dr. Grote said that Milliman "always seemed to answer questions in a way that he found to be truthful and accurate." Dr. Grote also noted that, "[w]hile it is possible that [Milliman] was deliberately lying to me some or all of the time, it instead appeared to me that he believed what he said."

could not reasonably infer that these statements—which comprise just two sentences in a thorough sixteen-page report—improperly influenced his overall conclusion.

Next, Milliman argues that a jury could reasonably infer Dr. Grote's report is pretextual because the results of the psychological testing were nearly identical to the results in 2003 when Milliman was found fit for duty. Not so. Although the 2003 and 2011 results are largely the same, Dr. Grote found that there was a meaningful difference in Milliman's scores on two sub-tests of the MMPI-2. Specifically, Dr. Grote opined that Milliman's results on those sub-tests showed "feelings of paranoia and dysfunctional thoughts and emotions, and lack of insight."

Milliman asserts that his MMPI-2 results did not indicate a permanent psychological trait, but simply reflected his mental state on the day in question. To support that assertion, he points to Dr. Grote's testimony that Milliman's MMPI-2 scores might have been partially explained by the threat of being terminated. However, Dr. Grote also stated that this could not completely explain Milliman's test results. In other words, the test results reflected, at least to some degree, an underlying psychological condition.

Moreover, even if the MMPI-2 results were driven in part by a temporary mental state, there were numerous other indicators of frontal lobe dysfunction. Therefore, any potential misreading of the MMPI-2 does not undermine Dr. Grote's overarching conclusion that Milliman has "cognitive and psychological problems that are consistent with the effects of his having had a right frontal lobe (insula cortex) brain tumor along with chemotherapy and radiation." More importantly, it does not weaken the defendants' reasonable reliance on Dr.

Grote's conclusion that Milliman had "cognitive and psychological problems that seem to significantly interfere with his ability to effectively work as a deputy sheriff." Having learned of this fact "that would lead to a legitimate discharge, we cannot require the employer to ignore the information." *See Koziara v. BNSF Ry. Co.*, 840 F.3d 873, 875 (7th Cir. 2016) (quoting *McKennon v. Nashville Banner Publ'g Co.*, 513 U.S. 352, 362 (1995)).

In addition, Milliman argues that a jury could reasonably conclude that Dr. Grote's conclusion is pretextual based upon Dr. Dawkins's expert report. However, while Dr. Dawkins critiqued Dr. Grote's methodology—namely, his reliance on outside information instead of objective findings—she does not dispute Dr. Grote's ultimate conclusion. In other words, despite reviewing all of the same information and documents reviewed by Dr. Grote, Dr. Dawkins does not opine that Milliman was in fact fit for duty.

Regardless, Dr. Dawkins's criticisms were not available to defendants when they decided to terminate Milliman, and thus do not show that defendants' reliance on Dr. Grote's report was disingenuous. "Pretext involves more than just faulty reasoning or mistaken judgment on the part of the employer; it is [a] lie, specifically a phony reason for some action." *Lord*, 839 F.3d at 564 (alteration in original) (internal quotation marks omitted) (quoting *Argyropoulos*, 539 F.3d at 736). Dr. Dawkins's criticisms may show that Dr. Grote's report was a "foolish or trivial or even baseless" ground upon which to terminate plaintiff. *Id.* (quoting *Culver*, 416 F.3d at 547). However, that does not challenge defendants' assertion that, based upon Dr. Grote's report, they honestly believed

Milliman was unfit for duty. *See id.* In light of that honest belief, defendants had a legitimate non-retaliatory reason to terminate Milliman, and we may not "second-guess" that decision. *Id.* (quoting *Argyropoulos*, 539 F.3d at 736).

Finally, Milliman argues that a jury could question whether Milliman's fitness examination was ordered in good faith because he received a "standard" rating in his last annual performance review. However, we recently cited "many instances of public safety agencies requiring psychological evaluations of their employees." *Freelain v. Vill. of Oak Park*, 888 F.3d 895, 903 (7th Cir. 2018). In particular, we stressed the importance of such precautionary measures in the law enforcement context due to "the risks posed by an officer who is not well enough to work." *Id.* Here, plaintiff's bizarre allegations of widespread corruption, human trafficking, and solicitation of murder by the Sheriff were certainly enough to put defendants on notice of a potential mental health issue. Thus, defendants properly referred Milliman for a psychological evaluation.[6]

---

[6] Plaintiff also notes that MCSD's internal file was titled "Termination Review," thus implying that Milliman's fate was somehow preordained. Plaintiff's concern is overstated. A termination "review" implies precisely that—an "assessment of something with the intention of instituting change *if necessary*." *Review*, English Oxford Dictionaries, https://en.oxforddictionaries.com/definition/review (last visited June 14, 2018) (emphasis added). It does not declare an inescapable outcome. Moreover, plaintiff's argument misses the central issue. It is undisputed that, following Milliman's 2010 deposition, his future at MCSD was in doubt. That fact, however, does not speak to the critical question in this case—i.e., *why* defendants ultimately fired plaintiff. Of course, defendants could not ter-

In sum, Milliman has not produced evidence from which a jury could reasonably conclude that defendants' proffered reason for his termination—Dr. Grote's finding that he was unfit for duty—was pretextual. Having failed to do so, there is no genuine dispute of material fact on this issue for trial. Because Milliman would have been fired based on his fitness-for-duty examination even absent the protected speech, he cannot establish the requisite "causal connection between unconstitutional motive and resulting harm." *Thayer*, 705 F.3d at 252 (quoting *Hartman v. Moore*, 547 U.S. 250, 260 (2006)). Therefore, his First Amendment claims must fail.

## B. Derivative Claims

Milliman's state law conspiracy claim and *Monell* claim are derivative of his First Amendment claims. Because his First Amendment claims fail, defendants are also entitled to summary judgment on his derivative claims.

## III. Conclusion

For the foregoing reasons, we AFFIRM the judgment of the district court.

---

minate plaintiff because of his protected speech. However, they could terminate plaintiff if they honestly believed he was suffering from psychological difficulties that interfered with his work duties. Therefore, the title of MCSD's internal file, standing alone, is unavailing. In any event, for the reasons explained *supra*, the only reasonable conclusion to draw from the record is that defendants ultimately relied upon Dr. Grote's fitness-for-duty findings. Plaintiff has not produced any evidence from which a jury could reasonably infer that Dr. Grote even saw, let alone was unreasonably influenced by, the title of the internal file.